**UNITED STATES of America**

v.

**Victor Manuel GERENA, et al.**

**Crim. No. H–85–50(TEC).**

United States District Court,
D. Connecticut.

Feb. 26, 1987.

Albert S. Dabrowski, Carmen E. Van Kirk, John A. Danaher, III, Stanley A. Twardy, Jr., U.S. Atty., David D. Buvinger, William J. Corcoran, Trial Attys., U.S. Dept. of Justice, Hartford, Conn., for plaintiff.

Jacob Wieselman, Hartford, Conn., for defendants.

RULING ON DEFENDANT LUZ M. BERRIOS–BERRIOS' MOTION REGARDING VIOLATIONS OF 18 U.S.C. SEC. 2517(5)

CLARIE, Senior District Judge.

The defendant, Luz M. Berrios-Berrios, moves this Court seeking the dismissal of the pending indictment and the suppression of certain electronic surveillance evidence on the ground that government agents conducting electronic surveillance operations pursuant to court authorization failed to follow the procedures outlined in 18 U.S.C. sec. 2517(5). The Court finds that the defendant's motion is entirely without merit and denies the relief requested.

## Facts

On April 27, 1984, federal law enforcement officials obtained authorization to electronically intercept oral and wire communications at three separate locations in Puerto Rico. The focus of the present motion to dismiss centers on conversations intercepted at the first of these three locations: a residence located at 3384 Levittown Boulevard, Levittown, Puerto Rico (hereinafter the Levittown location). In the Government's application for an order authorizing the interception of conversations at the Levittown location, Special Agent Jose Rodriguez stated that the Government's investigations had uncovered a connection between individuals targeted in the surveillance application and various crimes committed against the United States. The targeted individuals were believed to be members of an organization commonly known as Los Macheteros, a clandestine terrorist organization seeking the independence of Puerto Rico. The agent listed the various suspected crimes in his affidavit, including mention of conspiracy to oppose the Government of the United States by force; interference with commerce by threats or violence; malicious destruction of property of the United States by means of an explosive; malicious destruction of property used in or affecting interstate or foreign commerce by means of an explosive, and conspiracy to commit these crimes.

The present pending superceding indictment charges the defendants with various illegal acts associated with the September 12, 1983 robbery of the Wells Fargo Depot in West Hartford, Connecticut. The list of crimes recited in the original Levittown electronic surveillance application includes no mention of the West Hartford robbery. The Government's position is that law enforcement officials first learned of a probable connection between the individuals targeted in the Levittown surveillance operation and the West Hartford robbery in part, as a result of the Levittown surveillance activities themselves, wherein federal agents overheard various statements implicating the targeted individuals and others in the West Hartford robbery.

Copies of the surveillance orders and progress reports reveal that the original Levittown surveillance order was extended on May 25, 1984, and again on June 23, 1984. Progress report #10, submitted pursuant to the May 25 extension of the original Levittown order, discusses a June 21, 1984 overhear, wherein targeted individuals discussed a certain Robin Hood-type operation. In that conversation the speakers talked about distributing large sums of money to various individuals. The following progress report, submitted pursuant to the June 23 extension of the original Levittown order, discusses a July 1, 1984 overhear, wherein targeted individuals discussed a project code-named "Aguila Blanca." The individuals also mentioned the names of several cities in the United States, including Hartford, and also an anniversary date of September 12. The Government's position is that these overhears supplied important clues leading to the Government's subsequent conclusion that the targeted individuals and others were involved in the West Hartford robbery.

On or about July 3, 1984, the occupants of the Levittown residence moved to a new residence referred to as Calle 2, B-2, El Cortijo, Bayamon, Puerto Rico (hereinafter the El Cortijo location). The Government terminated its Levittown location surveillance and made application for an order authorizing the interception of oral and wire communications at the new El Cortijo residence. The El Cortijo order was granted on July 27, 1984. Both the Levittown and El Cortijo applications, and all of the extensions thereof, were reviewed by Judge Perez-Gimenez. In applying for the El Cortijo order the Government made no mention of any suspected connection between the targeted individuals and the West Hartford robbery. The Government first discusses its suspicions concerning the involvement of the targeted individuals in the West Hartford robbery in its application for an extension of the El Cortijo authorization. In the Government's affidavit

supporting its application for an extension of the El Cortijo order, Special Agent Jose Rodriguez states:

It should be noted that recent FBI investigation has confirmed an apparent association between the subjects of this investigation and Victor Manuel Gerena, the chief suspect in the September 12, 1983 Wells Fargo robbery of 7½ million dollars in Hartford, Connecticut. This association has been suspected because of previously reported conversations of these subjects about transfers of millions of dollars, giveaways of large sums of money in the Hartford area to obtain a Robin Hood image ... and references to a September 12 anniversary date for the giveaway.

It is the Government's position that it was not until this time that it believed conclusively that the targeted individuals were involved in the West Hartford robbery. The affidavit clearly discusses the intercepted conversations mentioned previously and how these interceptions, in conjunction with other evidence, led the Government to discover the targeted individuals' involvement.

The order authorizing the extension of the El Cortijo surveillance was signed by Judge Perez-Gimenez on August 25, 1984. Despite the fact that the affidavit of Agent Rodriguez discusses the West Hartford robbery, the order itself makes no mention that the targeted individuals were suspected of having been involved in it. The first order to formally outline the alleged West Hartford crimes allegedly committed by the targeted individuals is an order issued on March 1, 1985. This March 1 order authorized the electronic surveillance of an entirely different location in Puerto Rico and had nothing to do with the Levittown and El Cortijo orders.

## Discussion

The defendant argues that the Court must suppress evidence gathered as a result of the Levittown and El Cortijo electronic surveillance operations because the Government, once it learned of the connection between the targeted individuals and the West Hartford robbery, failed to obtain the requisite judicial authorization necessary to permit the Government to present such evidence to the Grand Jury and to use such evidence at trial. The defendant points out that where, as here, the Government stumbles across evidence linking the targeted individuals to crimes other than those for which the electronic surveillance was authorized, the Government must bring the "other crimes evidence" to the attention of the supervising court and seek its authorization before using the evidence against the targeted individuals. The defendant notes that, in the present case, the Levittown and El Cortijo orders, including the extensions to the Levittown order, were obtained pursuant to the investigation of crimes having nothing whatsoever to do with the West Hartford robbery. The defendant accepts the conclusion that the Government first learned of an association between the targeted individuals and the West Hartford robbery partly as a result of the Levittown surveillance activities. Nevertheless, the defendant argues that, because the Government failed to formally petition the supervising court for authorization, the Government could not properly have used the West Hartford robbery evidence, obtained pursuant to the Levittown surveillance, against the defendants. The defendant also asserts that the Government's Levittown progress reports (wherein government agents detailed the nature of the various conversations intercepted including the June 21 "Robin Hood" conversation and the July 1 "Aguila Blance" conversation) together with the Government's El Cortijo extension application (wherein government agents specifically outlined the nature of the targeted individuals' suspected involvement in the West Hartford robbery) do not constitute proper application for judicial authorization enabling the Government to use such "other crimes evidence." The Court finds that the defendant's position is wholly without any legitimate foundation in law, and that the arguments advanced in

support of this position are wholly without merit.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified as 18 U.S.C. sec. 2510 *et seq.*, requires the Government to obtain judicial approval before it may use "other crimes evidence" obtained in the course of electronic surveillance activities. "Other crimes evidence" is merely evidence·which implicates a targeted individual in crimes other than those for which the electronic surveillance was originally sought. 18 U.S.C. sec. 2517(5) provides:

> [w]hen an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section [authorizing the use of such evidence in judicial proceedings] when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

While this section requires subsequent authorization, it does not specify the exact form an application for subsequent approval should take, nor exactly what procedures a court should follow in giving or denying its authorization. To fill this void, courts have routinely looked to Congress' intent in enacting this provision, and have generally held that Congress intended subsequent judicial authorization to serve the purpose of insuring that the surveillance activities revealing the other crimes evidence (1) was based upon a lawfully obtained warrant; (2) was lawfully conducted; (3) was not a subterfuge search had merely as a pretext for uncovering the "other crimes evidence"; and (4) that the intercepted communication revealing the "other crimes evidence" was intercepted inadvertently rather than as a target of the surveillance itself. *United States v. McKinnon,* 721 F.2d 19, 22 (1st Cir.1983); *United States v. Masciarelli,* 558 F.2d 1064, 1068 (2d Cir. 1977). *See United States v. Campagnuolo,* 556 F.2d 1209, 1214 (5th Cir.1977) (Congress adopted sec. 2517(5) because it "wished to assure that the Government does not secure a wiretap authorization order to investigate one offense as a subterfuge to acquire evidence of a different offense for which the prerequisites to an authorization order are lacking"). *See also* S.Rep. 1097, 90th Cong., 2d Sess., at 12, *quoted in* 2 U.S.Code Cong. & Adm.News. pp. 2112, 2189 (1968); H.Rep. 488, 90th Cong., 1st Sess., at 100. And in the absence of formal statutory guidelines, courts have generally permitted various forms of submissions and proceedings to constitute "subsequent judicial approval", provided that 1) the Government supplied sufficient information to the presiding court to enable it to determine whether the "other crimes evidence" was properly obtained in accordance with Congress' intent as outlined above; and 2) the presiding court had some opportunity to express its approval regarding the "other crimes evidence". *United States v. Van Horn,* 789 F.2d 1492, 1503 (11th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986) (courts have viewed sec. 2517(5)'s requirements flexibly).

■ Accordingly, an application for subsequent approval need not take any particular form, and no particular special judicial procedure is required. The approving judge need not particularize the "other crimes" conversations, nor must the judge have listened to or even know about every "other crimes" conversation. *United States v. Gambale,* 610 F.Supp. 1515, 1531 (D.Mass.1985). In addition, provided the four above-mentioned Congressional purposes have been fulfilled, "nothing in the statute requires that the supplemental court authorization be express rather than implied." *Masciarelli,* 558 F.2d at 1068.

Courts have "adhered to the view that the disclosure in subsequent affidavits to the issuing judge of material facts constituting or clearly relating to other offenses satisfies the requirements of sec. 2517(5) under the *Tortorello* rationale of implicit authorization.'" *Id.* at 1068 (citing *United States v. Tortorello,* 480 F.2d 764, 781–83 (2d Cir. 1973), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973)). Accordingly, "authorization under 18 U.S.C. sec. 2517(5) may be inferred when a judicial officer grants a continuation of the surveillance, even though the offense was not listed in the original order, so long as he was made aware of 'material facts constituting or clearly relating to other offenses' in the application for the continuance." *United States v. Ardito,* 782 F.2d 358, 362 (2d Cir.1986), *cert. denied,* — U.S. —, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986).

█ As one recent court decision has recited, "[c]ourts thus have considered the section 2517(5) approval requirement flexibly, and have held that the court need not have approved of the new charges as long as it has approved of the collection of the evidence supporting those charges." *United States v. Van Horn,* 789 F.2d at 1503. Accordingly, where the reviewing court receives detailed progress reports containing a specific account of the conversations being intercepted, and the judge extends the surveillance, thus evidencing that he or she reviewed the conversations which the Government intercepted, "[t]his suffices to meet [the] section 2517(5) requirement." *Id.* at 1504. This is so because courts " 'presume ... that in renewing [or continuing] the tap the judge carefully scrutinized those supporting papers and determined that the statute's requirements had been satisfied,' " *United States v. Masciarelli,* 558 F.2d at 1068 (quoting *United States v. Marion,* 535 F.2d 697, 703 (2d Cir.1976)), and because such review has been held to constitute implicit approval. *United States v. Tortorello,* 480 F.2d at 781–83. Thus, once again, " 'the disclosure in subsequent affidavits to the issuing judge of material facts constituting or clearly relating to other offenses' satisfies

the Government's obligation to seek judicial authorization for the disclosure and use of evidence inadvertently intercepted." *United States v. Johnson,* 696 F.2d 115, 125 (D.C.Cir.1982) (quoting *United States v. Masciarelli,* 558 F.2d at 1069).

█ In the present case, the "other crimes evidence" was brought together and discussed in the papers submitted to Judge Perez-Gimenez for the second order extending the El Cortijo tap. This discussion specifically mentioned the June 21 and July 1 Levittown interceptions. The Court presumes that the reviewing judge "carefully scrutinized those supporting papers" and determined that the requirements of Title III, including sec. 2517(5), had been satisfied. *Masciarelli,* 558 F.2d at 1068. Certainly Judge Perez-Gimenez had enough information before him to alert him to the fact that the Government had obtained "other crimes evidence." There is no evidence that the original Levittown order was a subterfuge search, or that the Levittown order was sought in bad faith, or that the "other crimes evidence" was intercepted other than incidentally. In addition, there is no evidence that Judge Perez-Gimenez failed to make this determination when he reviewed the papers submitted with the application for the extension of the El Cortijo order. In short, there is absolutely no basis for the defendant's claim that subsequent judicial authorization is missing. The presiding judge was continuously provided with a wealth of relevant information with regard to what the Government had uncovered connecting the targeted individuals with the West Hartford robbery. The judge was provided with the Government's analysis of how it connected the targeted individuals to the robbery and the "other crimes evidence" that served as the basis for this association. Thus the requirements for approval outlined in *Ardito, Van Horn, Masciarelli,* and *Johnson* have been met.

The defendant attaches much significance to the fact that the Government submitted its analysis of the targeted individu-

als' involvement in the West Hartford robbery as part of its application for a continuation of the El Cortijo tap. The defendant points out that the "other crimes evidence" was intercepted pursuant to the Levittown order, and argues that implicit authorization obtained pursuant to filings for the El Cortijo tap cannot constitute authorization of "other crimes evidence" obtained pursuant to the Levittown order. The defendant argues that *United States v. Marion*, 535 F.2d 697 (2d Cir.1976), supports this argument. The defendant's mischaracterization of *Marion* merits little discussion, except in so far as to illustrate the untowardness of the defendant's reliance thereon for the untenable proposition recited above.

In *Marion*, the defendant challenged the use of evidence obtained as a result of two separate state wiretaps. The first one, the "Lounge tap", authorized the interception of communications providing evidence of certain state crimes, including the crimes of extortion, felonious assault, and conspiracy to commit these offenses. The Lounge order was renewed, and in support of his application for renewal, the assistant state district attorney notified the presiding state judge that evidence obtained from the Lounge tap implicated the defendants in certain federal crimes. The fruits of this Lounge tap were used before a federal Grand Jury, and the *Marion* court upheld this use finding that the required sec. 2517(5) approval had been impliedly given by the state judge on the basis of the information supplied by the assistant district attorney.

The second wiretap, the "Delmonico tap", was never renewed, continued, or amended, and was authorized to provide only, inter alia, evidence of the state law crime of the illegal possession of a dangerous firearm. The Delmonico tap revealed evidence implicating the defendant in certain federal firearms offenses. Such evidence, however, was never brought to the attention of the presiding court at any time, in any form, or in any way resembling a request for subsequent approval even under the flexible standards of sec. 2517(5). *See Marion*, 535 F.2d at 704, n. 14. The *Marion* court found on the basis of this fact that *no* attempt had been made to obtain judicial authorization, either of an express or an implied nature, so as to allow the use of the Delmonico tap evidence in the federal prosecutions. Accordingly, the court reversed so much of the defendant's conviction as had been based upon the use of the unauthorized evidence. This result must be compared with the other portion of the *Marion* opinion, which upholds the subsequent use of other crimes evidence uncovered as a result of the Lounge tap. There the assistant district attorney informed the presiding judge of the possibility that such evidence might be used in a federal prosecution. The present case is wholly similar to the Lounge tap situation, and, by comparison, wholly dissimilar to the circumstances surrounding the Delmonico tap.

The defendant further claims that *Marion* implicitly rejects the possibility that submissions made in the course of renewing the El Cortijo order, and judicial review of those submissions, could ever constitute implicit authorization of "other crimes evidence" obtained pursuant to the Levittown order, even though both the Levittown and El Cortijo orders were reviewed by the same judge, and both involved the same targeted individuals and the same suspected offenses.[1] This claim, however, is simply not supported by the *Marion* decision.

---

1. These factors alone readily distinguish *Marion* from the present controversy. In *Marion*, the Lounge and Delmonico orders were issued by different judges on the basis of different types of suspected crimes. In contrast, both the Levittown and El Cortijo orders were signed by the same judge for investigation of the same suspected crimes. The sole reason for the switch from the Levittown location to the El Cortijo location was that the individuals targeted in the Levittown residence moved to the new residence in El Cortijo. Thus, unlike the situation in *Marion*, the El Cortijo surveillance was, in reality, genuinely an extension of the Levittown operation. Although the Court does not necessarily rely on this observation in reaching its decision, this fact lends support to the Government's argument that *Marion* does not require suppression or dismissal under the facts of the present controversy.

■ It is clear that *Marion* does not require that the Government submit "other crimes evidence" for subsequent approval while the surveillance operation that uncovered such evidence is still in progress. Such would be a patently unrealistic requirement. In the present case the Government did not know the significance of the June 21 and July 1 conversations until after the Levittown surveillance operations had concluded. Thus it cannot be said that the Government reasonably should have submitted its analysis of the significance of the June 21 and July 1 intercepts, while the Levittown surveillance was still an ongoing operation. In any event, all that sec. 2517(5) requires is that the Government submit "other crimes evidence" as soon as practicable.

In the present case the Government met the "as soon as practicable" requirement when, as soon as it knew the significance of the June 21 and July 1 intercepts to the West Hartford robbery investigation, it informed Judge Perez-Gimenez that such was "other crimes evidence". This occurred long before the Government used the evidence before the Grand Jury, and only shortly after it had actually intercepted the conversations. It must be noted once again that the Government initially reported the contents of the June 21 and July 1 conversations in the progress reports submitted pursuant to extensions of the Levittown order. The Court notes that this alone would appear to satisfy the "subsequent judicial approval" requirement as defined by the Eleventh Circuit in *United States v. Van Horn*, 789 F.2d at 1503 ("the Court need not have approved of the new charges as long as it has approved of the collection of the evidence supporting those charges"). The Court, however, does not rest on this observation. The Court proceeds further and, again, recognizes that the Government took the opportunity, in its submissions to Judge Perez-Gimenez with regard to its application to extend the El Cortijo tap, to fully inform the judge of the full significance of the "other crimes evidence" obtained as a result of the Levittown operation.

The defendant has been unable to point out exactly where the Government has failed to meet a particular sec. 2517(5) requirement. The defendant relies on the theory that *Marion* requires the Government to seek subsequent judicial approval in a manner wholly distinct from submissions filed in association with subsequent surveillance orders for different locations. *Marion*, however, does not specify exactly how approval must be sought, except in so far as to suggest that the Government must present sufficient information to permit the court to determine that the "other crimes evidence" was properly obtained; and that, to accomplish the task of supplying a sufficient amount of information to enable the court to make a proper determination, the Government must do more than make reference to the judicial approval obtained for "other crimes evidence" secured as a result of some other related surveillance activity. It is true that the *Marion* court clearly rejected the argument that all separate surveillance orders in a single general investigation "merge" so as to allow judicial approval of "other crimes evidence" obtained pursuant to one operation at one location to constitute judicial approval of "other crimes evidence" secured as a result of another operation at a different location. Nevertheless, this merely means that the Government must submit "other crimes evidence" *from each distinct oper-*

The Court also observes that the defendant's reliance on *Marion* may be misguided for another reason, namely that its precedential value is not free from doubt. Subsequent decisions in this Circuit have taken a lukewarm view of *Marion*. *United States v. Masciarelli*, 558 F.2d at 1067. Nevertheless, even assuming that *Marion* is fully binding precedent, its holding does not advance the defendant's argument and does not have the effect in this controversy that the defendant claims it has. Accordingly, the Court need not address this issue. In addition, since the Court perceives that no significant difference exists between the law of the First and Second Circuits with regard to the specific issues presented in this matter, the Court finds that no choice-of-law question is presented. *See Ruling on the Issue of the Applicability of First Circuit Law on the Defendants' Title III Claims*, doc. no. H–85–50, February 3, 1987.

*ation* for approval if it intends to use the fruits of a particular surveillance operation against targeted individuals. Thus the *Marion* Court held that there could be no implicit authorization for one operation merely because there existed implicit authorization for a second operation where "other crimes evidence" obtained from the former was never presented to a judge for approval. The *Marion* court did *not* hold, despite the defendant's suggestions to the contrary, that an actual submission of "other crimes evidence" during the course of applying for an extension of a subsequent order was per se invalid.

· Again, it is clear that *Marion* in no way prevents the Government from submitting "other crimes evidence" for approval while seeking continuation of a subsequent separate wiretap order. All that *Marion* condemned was the Government's attempt to claim that, because the "other crimes evidence" of the Lounge surveillance operation was judicially approved, then the "other crimes evidence" obtained as a result of the Delmonico operation was implicitly approved even though the Government made no attempt to submit "Delmonico evidence" to the court prior to use. This is a far cry from condemning the practice of the *actual submission* in a renewal application for a subsequent wiretap authorization of "other crimes evidence" obtained in the course of a previous surveillance operation, as is the case in the present controversy.

*Marion* clearly involves only an invalidation of the use of evidence where *no* attempt was made to obtain judicial authorization. In the present case, every attempt was made to apprise the presiding judge of all possible crimes revealed as a result of the Levittown and El Cortijo surveillance operations as soon as the Government became aware of them. It is of absolutely no moment that the Government took the opportunity in its El Cortijo continuation papers to inform Judge Perez-Gimenez that the June 21 and July 1 Levittown conversations constituted "other crimes evidence."

This was the first opportunity the Government had to make such a presentation, this being the point at which the Government concluded that these two intercepts in part linked the targeted individuals to the West Hartford robbery. It matters not how the Government supplied the supervising court with this information. There is no magic to any particular method where, as here, the relevant statute supplies no specific guidelines. All that matters is that the Government provided the supervising court with information sufficient for it to make a determination that the "other crimes" interceptions were obtained incidentally pursuant to a valid order which was lawfully obtained and executed, and that the information was supplied to the supervising court "as soon as practicable". Since the Government's El Cortijo submission was more than adequate to accomplish this task under the flexible standards of sec. 2517(5) as set out in the cases cited above, the defendant's present sec. 2517(5) challenge must be dismissed.

Clearly this Court would not condone a failure to comply with the minimum requirements of sec. 2517(5). However, again, by taking the conscientious steps that it did, the Government succeeded in supplying more than enough information sufficient to enable Judge Perez-Gimenez to determine whether the "other crimes evidence" described in detail to him was properly intercepted during the Levittown operation. Since the Court presumes that the judge carefully scrutinized the Government's submissions with regard to its application for continuation of the El Cortijo tap, and since there is nothing to suggest that any claim to the contrary is true, the Court concludes that Judge Perez-Gimenez made the proper 2517(5) determination. This is all that sec. 2517(5) requires. *United States v. McKinnon*, 721 F.2d at 23–24; *United States v. Masciarelli*, 558 F.2d at 1068–69.

*Conclusion*

For the foregoing reasons, the defendant's motion to dismiss the pending indictment and suppress certain electronic surveillance evidence based upon alleged violations of 18 U.S.C. sec. 2517(5) is denied.

SO ORDERED