**UNITED STATES of America,**

**v.**

**Carl CLEVELAND, et al.**

**Criminal Action No. 96–207.**

United States District Court,
E.D. Louisiana.

April 18, 1997.

Anthony J. Marabella, Jr., Marabella & Moore, Stephen Bishop Street, Jr., Baton Rouge, LA, for Carl W. Cleveland.

Risley C. Triche, Risley C. Triche & Associates, Napoleonville, LA, Marilyn Michele Fournet, Baton Rouge, LA, for Fred H. Goodson.

James 'Michael Small, Alexandria, LA, Katherine Wheeler, Steffes & MacMurdo, Baton Rouge, LA, for Maria F. Goodson.

Arthur A. Lemann, III, Arthur A. Lemann & Associates, New Orleans, LA, William R. Campbell, Jr., New Orleans, LA, Michael Seth Fawer, Smith, Jones & Fawer, LLP, Covington, LA, for Benjamin Bura Rayburn, Sr.

. Christopher Mar Guidroz, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA, George Shaddock, Pascagoula, MS, for Joe H. Morgan.

Dennis R. Bagneris, Waltzer & Associates, New Orleans, LA, Karl J. Koch, Lewis O.

Unglesby, Unglesby & Koch, Baton Rouge, LA, for Larry S. Bankston.

Ian Hipwell, Baton Rouge, LA, Robert J. Boitmann, U.S. Attorney's Office, New Orleans, LA, for U.S.

*Order Denying Defendant Bankston's Motion to Suppress Results of Electronic Surveillance and All Evidence Derived from Such Results and for an Evidentiary Hearing and Denying Defendant Bankston's Motion for Appropriate Relief*

VANCE, District Judge.

Before the Court is defendant Bankston's motion to suppress results of electronic surveillance and all evidence derived from such results and for an evidentiary hearing, which has been adopted by defendants Carl Cleveland, Fred Goodson, Maria Goodson, and Joe Morgan and defendant Bankston's motion for appropriate relief, requesting production of a taped meeting between Robert Miller and Terry Dunlevy. For the reasons stated below, both motions are DENIED.

## I. Introduction

Defendant Bankston [1] moves this Court to suppress the results of electronic surveillance intended to be introduced by the government at trial, along with all fruits of the results, and requests an evidentiary hearing on the issue. Bankston offers three independent reasons for suppression. First, Bankston charges that the electronic surveillance at issue was obtained through the use of affidavits that contained intentional and/or reckless false statements and material omissions. Second, Bankston maintains that the surveillance was not conducted in accordance with the minimization requirements of 18 U.S.C. § 2518(5). Finally, Bankston alleges that the government used the intercepted communications in an improper manner in violation of 18 U.S.C. § 2517(2). The Court finds no merit in any of these three contentions and finds that defendants are not entitled to an evidentiary hearing. The motion is therefore DENIED for the reasons stated below.

## II. Defendant's Suppression Motion Challenging the Truthfulness of the Affidavit in Support of the Surveillance Warrant

### A. *Franks v. Delaware*

Bankston cites eight instances in which he alleges that the affidavits supporting the surveillance in question included either false statements or material omissions, each of which, according to Bankston, negates probable cause. Bankston argues that he is entitled to an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and that the results of the electronic surveillance, along with any fruits of those results, should be suppressed.

In *Franks*, the Supreme Court determined that criminal defendants have a limited right,

---

1. Defendant Bankston filed this motion. Defendants Cleveland, Morgan, Fred Goodson, and Maria Goodson have filed motions to join Bankston's motion. While the government has not objected to the adoption of this motion by Cleveland, Morgan, Fred Goodson, and Maria Goodson, the Court notes that, as this motion is predicated largely upon a violation of Bankston's Fourth Amendment rights and on the allegedly insufficient minimization efforts of government agents for telephone calls in which he was involved, there is a potential standing problem in applying these parts of the motion to Cleveland, Morgan, Fred Goodson, and Maria Goodson. *See Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969) ("The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing."); *United States v. Fredericks*, 586 F.2d 470, 480 (5th Cir.1978) ("We adhere to the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."); *United States v. Willis*, 890 F.2d 1099, 1101 n. 3 (10th Cir.1989) (noting potential standing problem where appeal is based on insufficiency of minimization efforts for telephone calls in which appellant was not involved). However, as the Court finds no Fourth Amendment violation and no insufficiency in minimization efforts, the standing issue need not be reached. *See United States v. Blocker*, 104 F.3d 720, 725 n. 3 (5th Cir.1997) (standing issue need not be reached when no Fourth Amendment violation found); *Willis*, 890 F.2d at 1101 n. 3 (standing issue need not be reached when no minimization problem found to exist).

under the Fourth and Fourteenth Amendments, to challenge the truthfulness of factual statements made in an affidavit supporting a search warrant, subsequent to the *ex parte* issuance of the warrant. *Franks*, 438 U.S. at 155–56, 98 S.Ct. at 2676. *Franks'* rule is of "limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded." *Id.* at 167, 98 S.Ct. at 2682.

Under *Franks*, "[t]here is ... a presumption of validity with respect to the affidavit supporting the search warrant." *Id.* at 171, 98 S.Ct. at 2684. In order to receive an evidentiary hearing on suppression, a defendant attacking the validity of an affidavit supporting a search warrant must make a "substantial preliminary showing" that: (1) the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in the warrant affidavit and (2) the remaining portion of the affidavit is insufficient to support a finding of probable cause. *Id.* at 171, 98 S.Ct. at 2684; *see also, United States v. Dickey*, 102 F.3d 157, 161–62 (5th Cir.1996). The Court spelled out in some detail what it meant by a "substantial preliminary showing:"

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in

the warrant affidavit to support a finding of probable cause, no hearing is required.

*Id.* at 171–72, 98 S.Ct. at 2684.

■ The "substantial preliminary showing" requirement is not lightly met. *See United States v. Hiveley*, 61 F.3d 1358, 1360 (8th Cir.1995); *United States v. Tibolt*, 72 F.3d 965, 973 (1st Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996); *United States v. Wajda*, 810 F.2d 754, 758 (8th Cir.1987), *cert. denied*, 481 U.S. 1040, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987). Furthermore, even if the defendant makes the requisite substantial preliminary showing for an evidentiary hearing, suppression is still not mandated unless the defendant establishes at the hearing, by a preponderance of evidence, that the misstatements in question were made intentionally or with reckless disregard for the truth and that, with the false statement omitted, probable cause was lacking. *Franks*, 438 U.S. at 156, 98 S.Ct. at 2676.

■ The *Franks* holding has been extended to cover alleged omissions in a supporting affidavit, as well as false statements. *See United States v. Tomblin*, 46 F.3d 1369, 1377 (5th Cir.1995); *United States v. Atkin*, 107 F.3d 1213, 1216–17 (6th Cir.1997); *United States v. Hunter*, 86 F.3d 679, 682 (7th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996); *Hiveley*, 61 F.3d at 1360; *United States v. Collins*, 61 F.3d 1379, 1384 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 543, 133 L.Ed.2d 446 (1995); *United States v. Paradis*, 802 F.2d 553, 558 (1st Cir.1986). Courts have noted, however, that while omissions are not exempt from inquiry under Franks, affidavits containing omissions of potentially exculpatory information are less likely to present a question of impermissible official conduct than those that affirmatively include false information. *Atkin*, 107 F.3d at 1216–17; *United States v. Martin*, 920 F.2d 393, 398 (6th Cir.1990); *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir.1990). In cases involving omissions, to trigger an evidentiary hearing, a defendant must make a substantial preliminary showing that: 1) the omission was made intentionally and/or with reckless

disregard for the omission's tendency to mislead and 2) if the omitted material had been included in the supporting affidavit, there would not have been probable cause. *See, e.g., Atkin,* 107 F.3d at 1217 ("If the defendant does succeed in making a preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must consider the affidavit, including the omitted portions, and determine whether probable cause still exists."); *see also, Tomblin,* 46 F.3d at 1377; *Hiveley,* 61 F.3d at 1360; *Collins,* 61 F.3d at 1384; *Paradis,* 802 F.2d at 558.

■ The Fifth Circuit has acknowledged that "it will often be difficult for an accused to prove that an omission was made intentionally or with reckless disregard rather than negligently unless he has somehow gained independent evidence that the affiant had acted from bad motive or recklessly in conducting his investigation and making the affidavit." *United States v. Martin,* 615 F.2d 318, 329 (5th Cir.1980). For this reason, the Fifth Circuit has recognized that "when the facts omitted from the affidavit are *clearly critical* to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself." *Id.* (emphasis added). *See also, United States v. Cronan,* 937 F.2d 163, 165 (5th Cir.1991); *Hale v. Fish,* 899 F.2d 390, 400 (5th Cir.1990) (same); *United States v. Namer,* 680 F.2d 1088, 1094 (5th Cir.1982), *cert. denied,* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). Thus, under Fifth Circuit law, if the materiality of the omission is great enough, recklessness can be inferred. In such cases, the analytical concepts of materiality and recklessness are "bound together," collapsing the dual inquiry of *Franks* into both "intentionality" and "materiality" into a single inquiry into materiality. *Namer,* 680 F.2d at 1094. *But see, Colkley,* 899 F.2d at 301 (rejecting Fifth Circuit position that bad motive under *Franks* can be inferred from fact of omission alone because *Franks* intended for a inquiry into *both* intentionality and materiality in all cases). However, reckless intent is to be inferred only in extreme cases when the materiality of the omitted material is "clearly critical" to the probable cause determination.

As far as this Court is aware, the Fifth Circuit has done so only once and that was in the context of a civil case brought to challenge constitutional deprivations under 42 U.S.C. § 1983 after the defendant was acquitted. *See Hale,* 899 F.2d at 400. In that case, the defendant had been prosecuted for kidnapping, and the affiant who attested to the application for the arrest warrant omitted two "clearly critical" facts negating probable cause for the arrest: that all witnesses interviewed, with the exception of the alleged victim, expressed the belief that the alleged victim was not being held against his will and that a number of witnesses interviewed expressed their belief that the actions taken by the alleged kidnappers were done pursuant to an ongoing FBI investigation.

■ In applying the *Franks* analysis to this case, the Court finds that the defendant has failed to make the requisite substantial preliminary showing for an evidentiary hearing. The Court finds defendant's assertions of falsity and/or intentional omission unpersuasive in light of all of the information available to the affiant at the time of authoring each affidavit. Moreover, the Court finds that any alleged false statements or omissions are immaterial in that they do not negate probable cause. The Court will analyze the basis for the probable cause determination in the November 25, 1994 affidavit and then the validity of Bankston's claim that the FBI agent "intentionally misled the District Court and tricked the Court" into issuing the surveillance authorization. Record Doc. No. 136, Defendant's Memorandum in Support of Motion to Suppress Results of Electronic Surveillance and All Evidence Derived from Such Results and Motion for Evidentiary Hearing ("Defendant's Suppression of Electronic Surveillance Memo") at 2.

**B. The November 25, 1994 Affidavit and the Basis for Its Determination of Probable Cause**

As defendant points out, the November 25, 1994 affidavit was issued based on allegations that are unrelated to the conduct charged in the present indictment—specifically, that then-Senator Bankston was "engaged in a

scheme to defraud the citizens of the State of Louisiana of his honest services in order to receive a disguised interest" in a proposed casino to be owned by the Jena Choctaw Indian tribe ("the Tribe"). Defendant's Suppression of Electronic Surveillance Memo, Exhibit 1, November 25, 1994 Affidavit (hereafter "November 25, 1994 Affidavit") at 7. The November 25, 1994 affidavit states that Bankston, who was then chairman of the Louisiana State Senate Judiciary Committee B, was demanding an interest in the proposed casino in return for his assistance as chairman of Senate Judiciary Committee B in getting the proposed casino's application approved. *Id.*

The affiant, FBI Special Agent Larry D. Jones, based his conclusion that there was probable cause that Bankston was either engaged in or was about to be engaged in such a scheme on information that he obtained from public sources, consensually made tape recordings, and interviews of cooperating witnesses. *Id.* He states in the November 25, 1994 affidavit that the Jena Choctaw Indians had recently been seeking (and had eventually received) recognition as a tribe from the United States Bureau of Indian Affairs. This recognition made the Jena Choctaws eligible to obtain a federal gaming license from the United States Department of Interior, which they actively sought with the hopes of building a casino. To get the federal gaming license, the Jena Choctaws would have to place land in trust with the United States Department of Interior for their reservation/casino site. The affidavit reports that the Chief of the Jena Choctaw Indians, Jerry Jackson ("Chief Jackson"), had been taking steps toward building a casino. Specifically, the affidavit claims that Chief Jackson met with a real estate developer, Mike Brassett ("Brassett"),[2] who entered into an option agreement on 1900 acres of land earmarked for the reservation/casino. The affidavit further reports that Chief Jackson and Brassett entered into a verbal management agreement, whereby an operations and man-

agement group brought in by Brassett would receive 30% of the casino profits. *Id.* at 7–8.

The affidavit further states that in an attempt to put together the operations and management group, Brassett contacted Robert Miller ("Miller"),[3] an individual whom Brassett thought could assist him. Miller, who had known and associated with Bankston since they were both in their early twenties, met with Bankston, because of his considerable knowledge of the gaming industry. He sought Bankston's advice about the viability of the Jena Choctaw casino project. At the meeting, Bankston contacted the head of the Louisiana state agency that oversees Indian gaming by telephone and determined that the Jena Choctaws were close to being recognized as an Indian tribe by the United States Bureau of Indian Affairs. The November 25, 1994 affidavit reports that at the meeting with Miller, Bankston made reference to a piece of Louisiana legislation that he had authored, Act 817 of 1993 ("Act 817"), which Bankston noted might be a potential problem for the Jena Choctaw casino. *Id.* at 8.

The affidavit further states that, after Miller's initial meeting with Bankston, Miller informed the FBI that he had learned that Bankston directly contacted Chief Jackson and suggested that the Jena Choctaws might need his influence and help in order to receive federal approval as an official Indian tribe and/or approval for their casino application. Miller also reported that he had heard that Bankston represented that he could assist the Jena Choctaws through his authority as Chairman of the Senate Judiciary Committee. Miller informed the FBI that Brassett had asked him to meet with Bankston to determine and negotiate the status of his demands. At this point, Miller agreed to act as a cooperating witness for the FBI.

In addition to this information from Miller, Special Agent Jones relied on evidence from five "consensually recorded conversations"[4]

---

**2.** Brassett is referred to in the November 25, 1994 affidavit as the "Developer."

**3.** Miller is referred to in the November 25, 1994 affidavit as "an individual" at first, and then as the "cooperating witness" or "CW."

**4.** By "consensually recorded conversations", the Court means that at least one of the parties to the conversation—in this case Miller—agreed to have the conversation recorded.

by Miller in making his determination of probable cause. These conversations took place on September 19, September 21, September 30, October 6, October 19, and October 25, 1994, and they yielded the following information.

The affidavit states that in the conversation recorded on September 19, 1994, Bankston told Miller and Brassett that he had met with Chief Jackson several times. Bankston also represented to them that Chief Jackson said that he wanted Bankston to control ten percent of the casino project. Further, Bankston stated that Chief Jackson wanted Bankston to have some state and local Louisiana politicians provide the Jena Choctaws with "political cover" in the event that other gambling operators opposed their casino application. *Id.* at 10. When asked who the "other guys" were who had to be paid, Bankston declined to give any names. The following four excerpts from the September 19 conversation all contributed to Special Agent Jones' conclusion that there was probable cause to suspect that Bankston was attempting to involve himself corruptly in the Jena Choctaw casino project:

1. *Bankston:* [Bob], I've been around this a long time and I have not made a nickel off of any of this. And I—and I wasn't gonna let uh, this get past me. I mean, that's what they have been talking to me about for some time.

 *Miller:* [5] Okay.

 *Bankston:* And they trust me implicitly as, as you can imagine for them to tell me "I want you to get this."

 * * * *

2. *Miller:* What we've got to work with is, uh—we got—there's a couple of things we can work with. One is, is percentage of the net. The other thing is to—is to uh, consulting fees. You know, the old fashioned stuff. And uh, that will go on through the life of the project. Counsel in your case.

 *Bankston:* I don't want to be a lawyer.

*Miller:* Don't? What do you want to be?

*Bankston:* I don't want—I don't want to be a lawyer. I, being a lawyer all you can get paid for is your time and my time is—You can't get compensated adequately as a lawyer.

 * * * *

3. *Bankston:* He (Jackson) wants to be left alone by all the other gaming companies in the state. Let me tell you what, that's your biggest problem.

 *Brassett:* [6] Oh, I know, that's why we've kept this sucker so quiet.

 *Miller:* Explain to me what that means.

 *Bankston:* That Players will do anything and everything to stop and slow down this project.

 . . . .

 *Miller:* So what are you gonna do?

 *Bankston:* I can protect you from those guys.

 *Miller:* Because?

 *Bankston:* Because of who I am.

 * * * *

4. *Bankston:* There are some other people from Louisiana that I will need to take care of as a result of what the Chief tells me to do.

 *Brassett:* I'm not sure exactly what you're talking about obviously. I mean that know about this deal?

 *Bankston:* No.

*Id.* at 10–12.

The November 25, 1994 affidavit further states that Miller met with Chief Jackson on September 20, 1994 and that Chief Jackson confirmed that he wanted Bankston to receive ten percent of the management fees for the proposed Jena Choctaw casino. Miller also reported to the FBI that Chief Jackson expected Bankston to secure the amendment of Act 817 of 1993 and to ensure that riverboat operators did not cause problems for the Jena Choctaw casino in return for this

---

5. As noted above, the affidavit referred to Bob Miller as "CW". For the sake of clarity, the Court will refer to him by name even when quoting from the affidavit.

6. As noted above, the affidavit referred to Mike Brassett as the "Developer". For the sake of clarity, the Court will refer to him by name even when quoting the affidavit.

ten percent interest. The affidavit reports that Chief Jackson suggested that Miller try to reach some sort of accommodation with Bankston and described Bankston's influence as an "ace in the hole." *Id.* at 12. The affidavit also reports that in a September 21, 1994 recorded conversation with Miller, Chief Jackson's attorney, Terry Dunlevy, stated that Chief Jackson "was afraid of Bankston." *Id.* at 13.

A September 30, 1994 recorded conversation between Miller and Bankston provided further support for the Agent's probable cause determination. The following three excerpts from that conversation were quoted in the November 25, 1994 affidavit:

1. *Miller:* You know if we do uh, I don't know, we'll give you 5% of the 8% that we have, that the three of us have, is that going to be sufficient?

 *Bankston:* Oh, that will be fine.

 * * * *

2. *Bankston:* We'll take care of it, everybody that needs to be taken care of.

 *Miller:* Okay. Who's [sic] name do you want this stuff in?

 *Bankston:* Uh, I'm going to give you a corporate name.

 * * * *

3. *Miller:* I'm telling you that we're going to do this, we're going to give you the 5% and you're going to make the crooked ways straight.

 *Bankston:* And I'll, and I can do that. Because let me tell you what.

 *Miller:* You won, you beat the shit out of us.

 *Bankston:* They gonna, [Bob], they are going to come out like gang busters against us. That is why this thing has to be kept very quiet.

 *Miller:* Well, we're keep—Who's going to come out?

 *Bankston:* Everybody and his uncle.

 *Miller:* The other companies, you think?

 *Bankston:* Binion's all the way to uh, uh, Norbert Simmons. Nobody wants to see anymore of anything.

*Miller:* You think you can keep them off our backs?

*Bankston:* Yes, sir. Yes, sir.

*Id.* at 13–14.

The November 25, 1994 affidavit further reports that in an October 6, 1994 recorded conversation between Miller and Bankston, Bankston and Miller agreed that Bankston's potential interest in the Jena Choctaw casino could not be put in the name of a corporation but would instead have to be put in the name of an individual acting on Bankston's behalf. *Id.* at 14.

The affidavit also reports that in a consensually recorded conversation on October 19, 1994 between Bankston and Miller at Bankston's law office, Bankston stated that Chief Jackson was telephoning him frequently. In that same conversation, Bankston stated that he had telephoned Brassett during the previous week. The affidavit further states that "Bankston showed [Miller] a copy of the legislation (Act 817 of 1993) which Bankston may seek to amend as part of his performance for receipt of an undisclosed interest in the casino." *Id.* Moreover, Bankston is alleged to have spoken about the notion of using a private individual or "nominee" to help him acquire stock in Miller's management corporation. Finally, according to the November 25, 1994 affidavit, Bankston stated that he was going to arrange a meeting with Chief Jackson in the upcoming week, and he refused to allow Miller to be present at the meeting. *Id.*

The last consensually recorded conversation mentioned in the November 25, 1994 affidavit occurred on October 25, 1994. The affidavit alleges that, in that conversation, Bankston told Miller by telephone that he had spoken by phone with Chief Jackson and that Bankston's meeting with Chief Jackson was to be rescheduled. *Id.* at 15.

It was on the basis of all of this information that Special Agent Larry D. Jones concluded that there was probable cause that Bankston was attempting to involve himself illegally in the Jena Choctaw casino project. For purposes of this motion, Bankston concedes the validity of almost all of the information in the affidavit. *See Franks,* 438 U.S.

at 171, 98 S.Ct. at 2684 ("There is ... a presumption of validity with respect to the affidavit supporting the search warrant."). However, Bankston specifically alleges eight instances in which the November 25, 1994 affidavit supporting the initial application for surveillance either included false statements or omissions. Bankston further claims that each of these false statements or omissions negates probable cause. Each of the eight false statements and/or omissions is examined below.

### C. Alleged Intentional Misrepresentations and/or Omissions in the November 25, 1994 Affidavit

#### 1. Omission of the October 31, 1994 Conversation between Bankston and Miller

Of the eight alleged false statements and/or omissions, the most serious is Bankston's claim that the November 25, 1994 affidavit intentionally omitted mention of an October 31, 1994 taped conversation between Bankston and Miller, in which, according to the defense, "Bankston declared that he would not participate in any way in the Indian casino, and that he wanted nothing more to do with the project." Defendant's Suppression of Electronic Surveillance Memo at 3. The defendant claims that these statements directly contradict the government's theory that, at the time of the November 25, 1994 application, Bankston was attempting to involve himself with the Jena Choctaw casino project and that they should have therefore been included in the November 25, 1994 affidavit.

#### a. Intentionality

The record reflects that Special Agent Jones prepared the November 25, 1994 affidavit prior to October 31, 1994 and that he did not have a copy of the October 31st tape at the time he originally prepared the affidavit. *See* Record Doc. No. 158, United States' Memorandum in Opposition to Defendants' Motion to Suppress Results of Electronic Surveillance and All Evidence Derived From Such Results ("Government's Electronic Surveillance Opposition Memo"), Exhibit 1, Affidavit of Larry D. Jones at ¶ 1. However, the record also reflects that Special Agent Jones

became aware of the October 31st conversation prior to submission of his affidavit to the Court on November 25, 1994, reviewed the contents of the tape, and concluded that the contents of the conversation did not require him to amend the affidavit. *Id.* at ¶ 2. Special Agent Jones therefore clearly made an intentional decision to omit the October 31st conversation from the November 25, 1994 affidavit.

■ However, this does not necessarily satisfy the intentionality prong of the *Franks* test. Special Agent Jones attests that he did not believe the omission to be material, and defendant offers no direct proof that he did. To show intentionality or reckless disregard for the truth, the defendant must show that the affiant *believed* the omitted information to be material but left it out anyway. *See Tomblin,* 46 F.3d at 1377 ("Unless the defendant makes a strong preliminary showing that the affiant excluded critical information from the affidavit *with the intent to mislead the magistrate,* the Fourth Amendment provides no basis for a subsequent attack on the affidavit's integrity.") (emphasis added) (quoting *Colkley,* 899 F.2d at 303). *See also, United States v. Williams,* 737 F.2d 594, 602 (7th Cir.1984) (applying First Amendment definition of reckless disregard for truth to *Franks* setting); *United States v. Davis,* 617 F.2d 677, 694 (D.C.Cir.1979) (same).

However, as discussed above, the Fifth Circuit has recognized the difficulty of making such a showing in omissions cases and has therefore held that "when the facts omitted from the affidavit are *clearly critical* to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself." *Martin,* 615 F.2d at 329 (emphasis added). *See also, Cronan,* 937 F.2d at 165; *Hale,* 899 F.2d at 400; *Namer,* 680 F.2d at 1094. The Court therefore turns to the materiality prong of the *Franks* test to determine whether the materiality of the omission was great enough in this case for recklessness to be inferred.

#### b. Materiality

To show the materiality of the October 31st conversation, the defendant quotes the following excerpt:

Mr. Bankston: Bob, I'm going to stay away from Mike Brassett and stay away from this entire thing. The thing is going to blow up and I don't want to be involved when it blows up.

Mr. Miller: Okay.

Mr. Bankston: And I don't want to be involved with people that fucking tape people's telephone conversations.

Mr. Miller: That was interesting, wasn't it?

Mr. Bankston: I mean, I don't do business that way and I don't want to be around anybody that does that.

. . . .

Mr. Bankston: But I just can't afford to be involved with something, and particularly when the Chief is off in fucking never-never land on stuff, you know. He's over here; he's over there; I mean, he wants to do this—he wants to wake up one day and find somebody, have them, you know, give him a million dollars and not have to make any decisions, apparently or something. I don't know. So, I am fini.

Defendants' Electronic Surveillance Memo at 4; *id.*, Exhibit 2, Certified Transcript of October 31, 1994 Conversation at 7–8.

Defendant ignores, however, other relevant testimony in the October 31, 1994 conversation. In fact, despite Bankston's statement that he was "fini" with the project and his apparent ire at being surreptitiously tape recorded by Brassett, he makes a statement only seconds later in the same conversation that can reasonably be interpreted as an expression of continued interest in the Jena Choctaw casino project:

Mr. Bankston: I'll let you all go fight this battle and see if you all can . . .

Mr. Miller: Well, I don't know what to do exactly.

Mr. Bankston: I don't either. I don't either. I'm just . . . I've got kinda—I told the Chief that if you won't, ah, if you get, if you finalize a plan, come tell me what the plan is and then I'll determine whether or not I might be able to be of service to somebody—

Government's Electronic Surveillance Opposition Memo, Exhibit 3, Government's Transcript of October 31, 1994 Conversation at 6.

In that same conversation, Bankston indicated that he had told the Chief the week before that the Chief had to "get on one stick or the other" and to either "get in bed with Capital or get out." *Id.* at 7. Bankston also told the Chief that he had to figure out what he was going to do with Brassett because he could not "walk around ah, you know, pissing on people. . . ." *Id.* Bankston further told Miller the thing to do at that juncture was to "let it simmer awhile 'cause nobody's coming and bringing him [the Chief] anything. . . . Nobody's bringing him any deals." *Id.* Bankston concludes the conversation by telling Miller to "just hang loose and see what happens for awhile." *Id.* at 9.

In light of the entire conversation and the other evidence Special Agent Jones had before him, the Court finds that it was not unreasonable for Special Agent Jones to conclude that Bankston was still willing to proceed with the casino project if something could be worked out to his satisfaction—particularly if Brassett could be taken out of the deal. The Court finds that even if the omitted material from the October 31st conversation had been included in the November 25, 1994 affidavit, it would not have negated probable cause. The omission was therefore immaterial.

Under Fifth Circuit law, courts must "evaluate probable cause under a totality of the circumstances test." *Dickey,* 102 F.3d at 162; *see also, United States v. Cherry,* 50 F.3d 338, 341 (5th Cir.1995). In light of Miller's multiple statements to the FBI that Bankston was negotiating a deal in which he would exchange his political influence for an undisclosed interest in the Jena Choctaw casino, the multiple taped conversations containing statements that tended to corroborate the tip from Miller, and the ambiguity of Bankston's statements in the October 31st conversation, the Court concludes that there was probable cause to authorize electronic surveillance on November 25th, even when the full content of the October 31, 1994 conversation is considered.

1084

The reasonableness of Special Agent Jones' conclusion that Bankston had not actually withdrawn on October 31 from the alleged illegal activity surrounding the Jena Choctaw casino project is also borne out by subsequent events. In a December 14, 1994 conversation between Bankston and Miller, Bankston's continued interest in the project was made explicitly clear:

> Mr. Miller: ... Uh, what's, if I can uh, if I can put uh, you know take, take care of Brassett and take care of Capital Gaming, still want to work on this thing?
>
> Mr. Bankston: Yeah, but I'm, I'm not going to be involved with anything that Mike Brassett's involved with.
>
> Mr. Miller: I catch your drift.
>
> Mr. Bankston: I mean, I, I, after what he told you, do, do you trust him? And he sent a letter to me kind of th, threatening me.
>
> Mr. Miller: Oh, I didn't know that.
>
> Mr. Bankston: Yeah.
>
> Mr. Miller: He likes to write letters.
>
> Mr. Bankston: Yeah. Uh, I don't want to be involved with anybody that wants to talk about suing people.

Government's Electronic Surveillance Opposition Memo, Exhibit 4, Transcript of December 14, 1994 Conversation at 4.

> Mr. Miller: ... Well I'll let you go, I just wanted to, I'll keep you in touch—
>
> Mr. Bankston: Just give me a call.
>
> Mr. Miller: I'll give you, I'll keep you in touch on what's going on this, this uh, you know we have an understanding and I want to make sure that uh -
>
> Mr. Bankston: I appreciate that Bob.
>
> Mr. Miller: I leave, leave my side of the street clean on that one.
>
> Mr. Bankston: I appreciate it.

*Id.* at 8.

It is true that this conversation played no part in the agent's decision not to include the October 31st conversation in the November 25th affidavit, since it had not yet occurred at that time. However, this conversation clearly suggests that the agent's earlier conclusion that Bankston was still interested in partici-

pating in the Jena Choctaw casino project was not only reasonable, it was also correct.

The reasonableness of the agent's conclusion that the October 31 conversation did not negate probable cause is further borne out by Judge Polozola's later action on the government's application to search Bankston's office for documents relating to the Jena Choctaw Casino project. Judge Polozola authorized the search even though the contents of the October 31 conversation were disclosed in the application and the December 14 conversation was not even discussed. Judge Polozola obviously did not view the October 31 conversation as negating probable cause.

For all of the foregoing reasons, the Court finds the omission of the October 31st conversation in the November 25, 1994 affidavit immaterial. Defendant is therefore not entitled to a *Franks* hearing on account of this omission.

### 2. Alleged False Summary of the October 31, 1994 Conversation in the January 4, 1995 Affidavit

Bankston attacks a statement made in a January 4, 1995 affidavit attached to the first request for renewal of the electronic surveillance in Bankston's law office. According to Bankston, the agent who wrote the January 4, 1995 affidavit "created a new version of the October 31 conversation" when he represented to the Court that:

> During another consensually recorded conversation, [Robert Miller] and Bankston discussed the fact that [Mike Brassett] had begun to independently tape record telephone conversations. Bankston responded in this conversation that he cannot afford to deal with people who record telephone conversations. As a result of Bankston's concerns over [Brassett] recording conversations, Bankston told [Miller] that [Brassett] needs to be removed from the Jena Choctaw casino.

Defendant's Suppression of Electronic Surveillance Memo, Exhibit 5, January 5, 1995 Affidavit ("January 5, 1995 Affidavit") at ¶ 9. Bankston argues that this statement is false because Bankston said nothing in the October 31, 1994 conversation about whether

Brassett needed to be removed from the Jena Choctaw casino project.

The government responds by pointing out that the above-quoted statement from the January 4, 1995 affidavit was based on statements made not only in the October 31, 1994 conversation, but also on statements made in a December 14, 1994 conversation. The government relies on the following statements to support the accuracy of the January 4, 1995 affidavit:

> Mr. Bankston: And I don't want to be involved with people that fucking tape people's telephone conversations.
>
> Mr. Miller: That was interesting, wasn't it?
>
> Mr. Bankston: I mean I don't do business that way and I don't want to be around anybody that does that.

Government's Electronic Surveillance Opposition Memo, Exhibit 3, Transcript of October 31, 1994 Conversation at 5.

> Mr. Miller: ... Uh, what's, if I can uh, if I can put uh, you know, take, take care of Brassett and take care of Capital Gaming, still want to work on this thing?
>
> Mr. Bankston: Yeah but I'm, I'm not going to be involved with anything that Mike Brassett's involved with.
>
> Mr. Miller: I catch your drift.
>
> Mr. Bankston: I mean, I, I, after what he told you, do, do you trust him? And he sent a letter to mean kind of th, threatening me.
>
> Mr. Miller: Oh, I didn't know that.
>
> Mr. Bankston: Yeah.
>
> Mr. Miller: He likes to write letters.
>
> Mr. Bankston: Yeah. Uh, I don't want to be involved with anybody that wants to talk about suing people.

Government's Electronic Surveillance Opposition Memo, Exhibit 4, Transcript of December 14, 1994 Conversation at 4.

> Mr. Miller ... So, let me tell you what our, our plan is, is that uh would be to get somebody to come in and be an angel and uh, take Brassett and this other guy out. I think the Chief wants him out too, don't you?

> Mr. Bankston: He does. He definitely does.

*Id.* at 5.

> Mr. Miller: ... Do you have any suggestions?
>
> Mr. Bankston: I, I think you're doing all right cause uh the Chief is not going to deal with Brassett. Mike Brassett's out of control.

*Id.* at 6.

Clearly, the statements in the January 4, 1995 affidavit are true in light of both the October 31, 1994 and December 14, 1994 conversations. Bankston's request for a Franks hearing with regard to this alleged "false statement" must therefore be denied.

**3. Alleged False Statement and Material Omission about the October 19, 1994 Conversation between Bankston and Miller**

Bankston makes much of a single sentence found in paragraph 20 of the November 25, 1994 affidavit, which states:

> Bankston showed [Robert Miller] a copy of the legislation (Act 817 of 1993) which Bankston may seek to amend as part of his performance for receipt of an undisclosed interest in the casino.

Defendant's Suppression of Electronic Surveillance Memo, Exhibit 1, November 24, 1994 Affidavit at 14.

The defendant argues that "[t]he affidavit's claim is clear—Bankston told Miller that he would seek to amend this Act as part of his performance." Defendant's Electronic Surveillance Memo at 12. However, the defendant distorts the quoted portion of the affidavit. The affidavit does *not* say that Bankston told Miller he would amend Act 817. Rather, it states that he merely showed Miller a copy of the legislation, which he *may* seek to amend.

Furthermore, the Court finds that there is nothing false about the affidavit's suggestion that Bankston "may seek to amend [the Act] as part of his performance for receipt of an undisclosed interest in the casino." It is important to consider that, prior to the October 19th conversation, Special Agent Jones had already been told by Miller that Bankston noted that Act 817 might be a problem

for the Jena Choctaws. *See* November 25, 1994 Affidavit at 8. He had been also been informed that Chief Jackson said that Bankston was to receive ten percent of the management fees for the proposed casino in return for, among other things, amending Act 817. *See* November 25, 1994 Affidavit at 12. Further, the October 19th conversation confirmed that Chief Jackson was concerned about Act 817, that he wanted Bankston to take care of any problems that might arise as a result of it, and that both Bankston and Miller knew this. The following excerpt from the October 19th conversation illustrates this point:

> *Miller:* I didn't give—I didn't raise hell with him [Chief Jackson]. But, I mean, you know, the first thing he says is, all white people look the same and Larry Bankston has to get ten percent of the deal. I'm sitting there, you know, with all of these people, he's saying this shit. And—and, you know, Larry Bankston's gonna and Larry's gonna go take care [sic] Act 77—87—what is it 817?
>
> *Bankston:* No. If they need to be taken—
>
> *Miller:* I know.
>
> *Bankston:* They're a little worried about this Act.

Government's Electronic Surveillance Opposition Memo, Exhibit 5, Transcript of October 19, 1994 Conversation at 17–18.

In light of the content of the October 19th conversation and the background information given to Special Agent Jones, it was not unreasonable for him to have concluded that Bankston *may* seek to amend the Act as part of his performance for receipt of an interest in the casino.

The defense points to the fact that Bankston stated in the October 19th conversation that "the statute doesn't apply to them," *id.* at 18, and that this piece of information was omitted from the November 25, 1994 affidavit. However, the Court finds this omission immaterial. First, the meaning of Bank-

ston's statement is not entirely clear from the tape. Second, even if the authorizing Court had been told that Bankston stated in the October 19th conversation that he thought the Act did not apply to the Jena Choctaw's casino project, this would not change the fact that Bankston had discussed, in the past, with both Chief Jackson and Miller, that he would take steps to amend the Act if necessary. In light of the other information provided to Special Agent Jones, that Bankston thought that the Jena Choctaw's fears concerning the Act might have been unfounded does not negate probable cause.

Finally, Bankston is correct in pointing out that the affidavit erroneously stated that Bankston showed Miller a copy of Act 817. In fact, the transcript reveals that Bankston showed Miller a copy of a report that contained references to portions of Act 817 instead of an actual copy of the Act. *Id.* at 18. While this may be an error in the affidavit, it can hardly be considered a material error that negates probable cause.

The Court finds no material misstatements or omissions in the November 25, 1994 affidavit concerning the October 19, 1994 conversation.

### 4. Alleged Material Omission about the September 21, 1994 Conversation

Bankston also attacks a portion of the November 25, 1994 affidavit that describes a September 21, 1994 meeting between Miller and Terry Dunlevy ("Dunlevy"), an attorney for Chief Jackson. The description of the meeting, which was not attended by Bankston, consists of a single sentence, which reads:

> In a consensually recorded meeting with [Miller] on September 21, 1994, Terry Dunlevy, attorney for Chief Jackson, stated that the Chief is afraid of Bankston.

November 25, 1994 Affidavit at 12–13.

Bankston does not contest the truth of this sentence.[7] *See* Record Doc. No. 180, Defen-

---

**7.** Defendant cannot contest the validity of the statement because defendant has not been provided with a copy of the tape or a transcript. The Court, having reviewed a copy of a transcript of the September 21st conversation *in camera*, states for the record that there is no

doubt that the statement made in the affidavit is true. *See* Sealed Document, Transcript of September 21, 1994 Conversation at 63–64 and 73.

In a separate motion, defendant has requested that this Court order the government to produce the tape or transcript on the grounds that the

dant's Reply Memorandum Regarding Motion to Suppress the Results of Electronic Surveillance and All Evidence Derived from Such Results ("Defendant's Electronic Surveillance Reply Memo") at 8. However, Bankston has learned through deposition testimony given by Robert Miller in a civil case, that once the Hobbs Act was brought up in the September 21st conversation, Dunlevy took the position that Chief Jackson no longer needed Bankston to be part of the deal. *See* Government's Electronic Surveillance Opposition Memo, Exhibit 6, Excerpt from Deposition of Robert Miller at 302–03. Bankston questions why this information was omitted from the November 25, 1994 affidavit.

The government admits that Dunlevy stated in the September 21st meeting with Brassett and Miller that the Chief no longer needed for Bankston to be a part of the casino deal. The government has furnished the Court with a transcript of that meeting for review *in camera*. It is clear from the transcript that when Dunlevy made this statement, he was told by Miller, Brassett, or both, that that was not what they were told by the Chief the previous morning. *See* Sealed Document, Transcript of September 21, 1994 Meeting at 36, 56–57, 59–62, 65–69, 72–74. The transcript of the September 21st meeting clearly shows that both Miller and Brassett thought that "what this guy [Dunlevy] said, he was covering his ass." *Id.* at 83.

Moreover, even the deposition of Miller cited by the defendant corroborates that Bankston was still considered to be in the casino project after the September 21st meeting. When Miller testified that Dunlevy

told him that he advised Chief Jackson not to proceed with Bankston in the casino project, he was asked point blank whether Bankston "was out of the deal." He responded unequivocally, "Oh, no. Mr. Brassett continued to pursue Senator Bankston." Record Doc. No. 158, Exhibit 6, Deposition of Robert Miller at 302–03.

That neither Miller nor the FBI ever thought that Bankston was "out of the deal" is further corroborated by a sworn statement by Miller, submitted by the government, which states unequivocally that:

> I did not think at any time during my recorded conversations with Larry Bankston that Larry Bankston had withdrawn from the Jena Choctaw Casino deal. I do recall Bankston stating that he was unwilling to continue dealing with developer, Mike Brassett. It was clear to me from my early contact with Bankston concerning the Jena Choctaw Casino that Bankston bragged the casino deal could not be done without his participation. No one from the FBI ever told me that the Jena Choctaw Casino deal with Bankston was over and that Bankston had withdrawn from participation in the casino. I never stated a concern to the FBI that Bankston had withdrawn from the Jena Choctaw Casino deal.

Record Doc. No. 196, Government's Memorandum in Opposition to Supplemental Offer of Proof, Affidavit of Robert Miller at 1–2.[8]

Finally, the Court notes that Miller's September 30th conversation with Bankston, quoted above, confirms that Bankston was still very much part of the Jena Choctaw

---

tape consists of Brady material. That motion is DENIED. The Court, having reviewed a transcript of the September 21st conversation in camera, concludes that the government's interpretation of that tape is accurate—*i.e.*, that the tape does not support the conclusion that Bankston had withdrawn from the Jena Choctaw casino project. In light of this finding, the Court concludes that the tape is neither Brady material nor subject to production under Fed.R.Crim.P. 16 as being "material" to Bankston's defense. Bankston's "Motion for Appropriate Relief," which requests that the tape be produced is therefore denied.

8. Bankston has submitted an affidavit from his lawyer, Lewis Unglesby, which contradicts Miller's account and claims that Miller told a different story when he was interviewed by Mr. Unglesby. *See* Record Doc. No. 204, Affidavit of Lewis O. Unglesby at 1. The Court finds this "offer of proof", consisting of a single hearsay statement by the defendant's lawyer, insufficient to warrant an evidentiary hearing, especially in light of the fact that the hearsay statement is expressly contradicted by a sworn statement of the declarant in question. *See* Record Doc. No. 196, Government's Memorandum in Opposition to Supplemental Offer of Proof, Affidavit of Robert Miller at 1–2.

Casino deal after the September 21st meeting. *See, supra,* pp. 1081–1082. Bankston's interest in the Jena Choctaw Casino deal is manifest in the September 30, 1994 recorded conversation.

The Court finds that the omission in issue did not negate probable cause and hence was immaterial. Despite Dunlevy's statement that the Chief no longer required Bankston to be a part of the deal, the transcript of the September 21st meeting, Miller's deposition, Miller's affidavit submitted to the Court in response to this motion, and the September 30, 1994 recorded conversation between Bankston and Miller all suggest that Bankston continued to be part of the Jena Choctaw casino project.

### 5. Alleged Material Omission about the October 31, 1994 Conversation between Robert Miller and Mike Brassett

Bankston also charges that the November 25, 1994 affidavit omits material information from an October 31, 1994 conversation between Robert Miller and Mike Brassett, which was recorded by Brassett. Defendant makes no showing, let alone the "substantial preliminary showing" needed for a *Franks* hearing, that Special Agent Jones knew about the information in question at the time the November 25, 1994 affidavit was signed and submitted to the reviewing court. Defendants merely assert that the information in question "was available to the FBI, either through its conversations with Miller or through the taping Miller performed on the FBI's behalf." Defendant's Electronic Surveillance Memo at 16. There is no offer of proof as to this assertion. In contrast, the government has submitted an affidavit from Special Agent Jones in which he explains that he "was not aware of the contents of the October 31, 1994, conversation between Robert Miller and Michael Brassett at the time the November 1994 affidavit was presented to the Court" and that he did not obtain a copy of the tape recording in question until February of 1995. Government's Electronic Surveillance Opposition Memo, Exhibit 1, Jones Affidavit at ¶ 3. The defendant has given this Court no reason to doubt that Special Agent Jones was unaware of the information that defendant claims should

have been included in the November 25, 1994 affidavit at the time the November 25, 1994 affidavit was submitted. Accordingly, the Court finds that defendant cannot satisfy the intentionality requirement of *Franks* as to the October 31, 1994 conversation between Miller and Brassett. There is, therefore, no need for this Court to consider the materiality requirement as to this conversation. There can be no recklessness, regardless of the nature of the omission, when the Court has reason to believe that the affiant was unaware of the existence of the omitted material at the time the affidavit was submitted.

### 6. Alleged False Statement about Bankston's Legislative Role

Bankston further alleges that the November 25, 1994 affidavit falsely stated Bankston's legislative role with respect to Indian gaming. The November 25, 1994 affidavit sets forth Bankston's legislative role as follows, in pertinent part:

> Bankston is a member of the Louisiana State Senate and is Chairman of Senate Judiciary Committee B (the Judiciary Committee). The Judiciary Committee, despite its name, is the committee which controls the consideration of all gaming legislation in the Louisiana Senate. As the Committee Chairman, Bankston largely controls the flow of proposed legislation and legislative hearings on gaming.

November 25, 1994 Affidavit at 5. Defendant does not challenge the validity of this part of the description. However, defendant claims that the following statement about Bankston's legislative role is false:

> The Committee reviews and approves all contractual agreements of the state regarding gaming during these hearings.

*Id.* at 6. Bankston charges that this is a particularly crucial misstatement considering its juxtaposition with the following true statement in the affidavit about the legal requirements for an Indian casino:

> To obtain a Class III license, the tribe must enter a compact with the state where the reservation/casino is located. This compact specifies issues such as the regulatory agency for the casino and how reve-

nues are to be distributed to the state or local governments.

*Id.* Bankston contends that the juxtaposition of these statements gives the false impression that Bankston had the right to review and approve the compact between the state and the Jena Choctaw tribe.

The Court agrees with Bankston that the statement that Senate Judiciary Committee B reviewed and approved all contractual agreements of the State regarding gaming is wrong. See Defendant's Suppression of Electronic Surveillance Memo, Exhibit 12, Affidavit of Diana Williamson at 1. However, the Court also finds that Bankston has failed to make a substantial preliminary showing of either intentionality or materiality, as required under *Franks.* Bankston has given this Court no reason to suspect that the incorrect statement was made intentionally or with reckless disregard for the truth, as opposed to merely being made negligently. Moreover, even if the false statement had been omitted, there still would have been probable cause to order the electronic surveillance. Taken as a whole, without the misstatement as to Bankston's legislative role, the November 25, 1994 affidavit conveys to the Court that Bankston was the Chairman of the committee that had the greatest authority over the regulation of gaming in Louisiana. It also informs the Court that Bankston made representations to Chief Jackson that the Jena Choctaws might have trouble being federally recognized as a tribe or being licensed by the state without his political influence. The affidavit also represents that Bankston stated that he would use his position as Chairman, and the political influence that gave him, to provide the Jena Choctaws with "political cover" in the event that other gaming operators opposed their casino application. Finally, the affidavit reflects that Bankston indicated he had enough power over these other gaming operators to make this representation good. *See* November 25, 1994 Affidavit at 12 (quoting September 19, 1994 recorded conversation). In light of the above, the Court finds that the erroneous statement about Bankston's legislative role is immaterial and does not entitle Bankston to an evidentiary hearing.

### 7. Alleged False Statement and Material Omission about the Necessity of Surveillance

Bankston also alleges that Special Agent Jones intentionally concealed facts in the November 25, 1994 affidavit which, if known, would have shown that the surveillance was not necessary under the law. As defendant points out, the initial affidavit and application for surveillance are required by statute to set forth "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

Special Agent Jones stated in the November 25, 1994 affidavit that the use of electronic surveillance was necessary, as opposed to continued reliance upon Miller as a cooperating witness, because Bankston made it clear that he would not include Miller in potentially incriminating conversations with third parties about his involvement in the Jena Choctaw casino project. The affidavit specifically stated:

> Bankston can be expected to utilize this same telephone and office to discuss such matters [related to the unlawful conduct alleged] with his stockholder nominee and with the 'other people in Louisiana' that he has to satisfy out of his five percent. Bankston's dealings with [Miller] on the subject make it clear that [Miller] will not be invited to witness such conversations and arrangements. Without an order granted pursuant to this application, these conversations and meetings will go undocumented.

November 24, 1994 Affidavit at 15–16.

Bankston alleges that the Court should have been told that the FBI had temporarily suspended Miller's operations. Even if the FBI had suspended Miller's taping of Bankston, Bankston fails to show how this disclosure would negate the finding of necessity. The Court therefore finds this omission immaterial. The affidavit clearly enumerated specific conversations that it reasonably expected would be of a potentially criminal nature and that would go undocumented if electronic surveillance were not implement-

ed. Even if the affidavit intentionally concealed that the FBI temporarily suspended Miller's operations—and this Court is not convinced that it did—this would not change the fact that a showing of necessity was made, nor would this alleged omission affect the existence of probable cause. Thus, the alleged omission does not entitle Bankston to an evidentiary hearing.

The Supreme Court has stated that the necessity requirement of 18 U.S.C. § 2518(1)(c) "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). This Court has no doubt that the November 25, 1994 affidavit demonstrated that the wiretaps were the only way to gather all of the relevant evidence of the suspected crime.

### 8. Alleged False Statement about Present Communications

Finally, Bankston attacks the validity of the November 25th affidavit's statement that:

> Use of the telephone is presently a principal means of communication between Bankston, [Miller], [Brassett] and Jackson wherein Bankston details the terms of his proposed corrupt services and demands.

November 25, 1994 Affidavit at 15. Bankston alleges that the statement is false, claiming that the last communication between Bankston and Miller prior to November 25, 1994 was on October 31, 1994, so that Bankston was not "presently" using the telephone as a principal means of communication with the other participants.

Bankston suggests that a proper statement might have been "Bankston has declared that he will no longer participate in the Indian casino project. He cannot be expected to have telephone conversations about the project with any of the other participants." Defendant's Electronic Surveillance Memo at 23. The Court disagrees with the defendant's view that this would be a more accurate statement than the one actually made in the November 24, 1994 affidavit. It is inaccurate to suggest that Bankston could no longer have reasonably been expected to be using the telephone to have conversations about the project after the last consensually taped conversation with Miller on October 31, 1994. This is especially true since Bankston had used the phone repeatedly to speak with the relevant participants in the casino project during the preceding period, and there was no monitoring of his phone calls between October 31 and when the surveillance began to know to whom he actually spoke during that interval. Moreover, it is clear that Bankston *did* in fact use the phone to talk about the casino project after November 25, 1996, a fact that further suggests the reasonableness of Special Agent Jones' suspicion that he would do so at the time he signed the November 25, 1996 affidavit.

Furthermore, the Court finds that the challenged statement is not materially false simply because it used the word "presently." The statement was intended to convey that the telephone was the principal means of communication between Bankston and the other participants to show the necessity of electronic surveillance. The statement was not materially untrue. Further, the necessity for the wiretap was already demonstrated through Bankston's statements that he would not involve Miller in certain potentially criminal future conversations. Moreover, whether or not Bankston had spoken to Miller between October 31, 1994 and November 25, 1994, there was still probable cause for the surveillance authorization.

Finally, the Court finds that *all* of the alleged omissions, and potentially false statements, taken together, do not negate the strong showing of probable cause in this case. The Court therefore finds that Bankston is not entitled to a *Franks* hearing.

## II. Minimization

### A. Introduction

Bankston also seeks to suppress the results of the electronic surveillance on the grounds that the agents conducting the surveillance failed to comply with the statutory requirement of minimization.

18 U.S.C. § 2518(5) provides that:

Every order and extension thereof ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter....

18 U.S.C. § 2518(5). Bankston also accuses the government of failing to comply with the issuing Court's order authorizing the surveillance, which provided that "all monitoring of communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation ...". Defendant's Suppression of Electronic Surveillance Memo, Exhibit 14, Order Authorizing Interception of Oral, Wire and Electronic Communications at 5. Bankston contends that the government's failure to minimize was so pervasive and flagrant as to require complete suppression of the results of the entire surveillance. Alternatively, Bankston seeks to suppress those specific conversations that he claims should have been minimized. Finally, Bankston seeks an evidentiary hearing on the adequacy of the government's minimization efforts. For the reasons stated below, the Court finds that the government's minimization efforts were entirely reasonable, that suppression is an inappropriate remedy as to any of the intercepted conversations, and that an evidentiary hearing is unwarranted.

**B. The Appropriate Remedy**

The Court notes at the outset that the remedy requested by Bankston for the alleged minimization violations—namely, total suppression of the electronic surveillance—has been explicitly rejected by the Fifth Circuit. In *United States v. Gaytan,* 74 F.3d 545 (5th Cir.), *cert. denied sub nom., Gandara–Granillo v. United States,* —— U.S. ——, 117 S.Ct. 77, 136 L.Ed.2d 36 (1996), *cert. denied sub nom, Macias–Munoz v. United States,* —— U.S. ——, 117 S.Ct. 506, 136 L.Ed.2d 397 (1996), the Fifth Circuit rejected the defendants' argument that the appropriate remedy for the government's failure to minimize intercepted conversations was suppression of all intercepted communications. The Court found the appropriate remedy to be exclusion of those interceptions that were improperly obtained, noting that

"[t]he exclusionary rule does not require the exclusion of those conversations that were properly intercepted as well." (citing *United States v. Morris,* 977 F.2d 677, 682 (1st Cir. 1992), *cert. denied,* 507 U.S. 988, 113 S.Ct. 1588, 123 L.Ed.2d 155 (1993); *United States v. Baldwin,* 987 F.2d 1432, 1436 (9th Cir.), *cert. denied,* 508 U.S. 967, 113 S.Ct. 2948, 124 L.Ed.2d 696 (1993)). Other courts that have considered the issue generally agree with this position. *See, e.g., United States v. Cox,* 462 F.2d 1293, 1301 (8th Cir.1972), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974) ("Clearly Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting incriminating evidence, also gathered extraneous conversations. If appellants ... have a remedy under Title III other than the suppression of conversations outside the warrant's scope, it lies in ... a civil suit against the investigating officers."); *United States v. Gassiraro,* 1986 WL 13072 (D.Mass. Nov.4, 1986) ("the legal proposition that only those conversations not properly minimized should be suppressed is undeniably supported by the overwhelming weight of authority.").

With the exception of two specific conversations discussed below, Bankston's minimization attack is not directed at evidence that the government has identified as evidence it intends to introduce at trial. Aside from these two specific conversations, the motion is therefore predicated upon the remedy of complete suppression, which is unavailable under Fifth Circuit law. *See Gaytan,* 74 F.3d at 554. In light of this Fifth Circuit authority, the crux of Bankston's minimization motion asks this Court to make countless moot determinations—an outcome that at one point Bankston explicitly professes to want to avoid. *See* Defendant's Electronic Surveillance Memo at 46.

Even if defendant Bankston were to question the applicability of *Gaytan,* suppression would still be wholly inappropriate in this case. Those courts that have allowed the remedy of complete suppression have done so only when there were violations of "egregious magnitude," which were in "flagrant disregard" of the duties of minimization.

*See, e.g., United States v. Lamantia,* 1996 WL 559950 (N.D.Ill. Sept.30, 1996) ("Total suppression can be imposed only when the defendant can establish that agents acted in 'flagrant disregard' of their minimization duties. This is an extremely heavy burden which can be satisfied only by showing violations of an 'egregious magnitude.' "). Such cases generally involve instances where the government has made effectively no effort towards minimization whatsoever. *See, e.g., United States v. Suquet,* 547 F.Supp. 1034, 1046 (N.D.Ill.1982) (an "inordinate number of unreasonable interceptions" must be shown before total suppression is justified); *United States v. Parks,* 1997 WL 136761 at *15 (N.D.Ill. March 24, 1997) (total suppression never allowed where government has made a prima facie case of reasonable minimization). As will be shown below, this is ·clearly not such a case. Thus, there can be no doubt that the remedy of complete suppression is unwarranted.

### C. The Burdens of Proof and Production

While the Fifth Circuit has yet to address the issue of the burdens of proof and production in minimization cases, most courts have held that when a defendant makes a generalized minimization challenge, the government bears the burden of making a prima facie showing of reasonable compliance with the minimization requirement. *See United States v. Torres* 908 F.2d 1417, 1423 (9th Cir.1990); *United States v. Willis,* 890 F.2d 1099, 1102 (10th Cir.1989); *United States v. Armocida,* 515 F.2d 29, 45 (3d Cir.), *cert. denied sub nom., Conti v. United States,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Quintana,* 508 F.2d 867, 875 (7th Cir.1975); *United States v. Rizzo,* 491 F.2d 215, 217 (2d Cir.1974), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974); *United States v. Sorapuru,* 902 F.Supp. 1322, 1330 (D.Colo.1995). *But see, United States v. Giacalone,* 853 F.2d 470, 482

(6th Cir.), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988) ("the district court correctly allocated the burden when it found that the defendant did not establish a lack of minimization under a Title III order.") (citing *United States v. Feldman,* 606 F.2d 673 (6th Cir.1979), *cert. denied sub nom., Zalmanowski v. United States,* 445 U.S. 961, 100 S.Ct. 1648, 64 L.Ed.2d 236 (1980)).[9] Once the government has made a prima facie showing, the burden then shifts to the defendant to show why the surveillance was improper. *See Torres,* 908 F.2d at 1423; *Willis,* 890 F.2d at 1102; *Armocida,* 515 F.2d at 45; *Quintana,* 508 F.2d at 875; *Rizzo,* 491 F.2d at 217; *Sorapuru,* 902 F.Supp. at 1330. Of course, the cases have recognized that "perfection is not usually attainable, and is certainly not legally required." *United States v. London,* 66 F.3d 1227, 1235 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1542, 134 L.Ed.2d 646 (1996). Rather, "the government is held to a standard of honest effort." *Id.*

### D. The Reasonableness Standard

■ In determining whether or not the government has made a prima facie case as to proper minimization, courts make a reasonableness determination. This is because the Supreme Court has recognized that neither the Fourth Amendment, nor 18 U.S.C. 2515, require government agents to avoid intercepting all nonrelevant conversations when conducting a wiretap investigation; rather that they require only an objectively reasonable effort towards minimization. *See Scott v. United States,* 436 U.S. 128, 137–140, 98 S.Ct. 1717, 1723–1724, 56 L.Ed.2d 168 (1978) ("The language of the [Fourth] Amendment itself proscribes only 'unreasonable' searches and seizures.... The statute [18 U.S.C. 2515] does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversa-

**9.** The Court notes that the rationale of *Giacalone,* namely, that the burden of proof and production generally rest on the movant in a suppression hearing, is perfectly consistent with Fifth Circuit law. *See United States v. Charles,* 738 F.2d 686, 696 (5th Cir.1984) ("It is established that both

the burden of production and the burden of persuasion generally rest with the movant in a suppression hearing."); *United States v. de la Fuente,* 548 F.2d 528, 533 (5th Cir.), *cert. denied,* 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977).

tions."). Whether minimization efforts were objectively reasonable is a fact-dependent inquiry based upon the information known to the government at the relevant points in time. *See Scott,* 436 U.S. at 140, 98 S.Ct. at 1724; *see also, London,* 66 F.3d at 1236 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1542, 134 L.Ed.2d 646 (1996); *United States v. Ozar,* 50 F.3d 1440, 1447 (8th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 193, 133 L.Ed.2d 128 (1995); *United States v. Earls,* 42 F.3d 1321, 1325 (10th Cir.1994), *cert. denied,* 514 U.S. 1085, 115 S.Ct. 1800, 131 L.Ed.2d 727 (1995).

In making this reasonableness determination, the Supreme Court has cautioned that "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer." *Scott,* 436 U.S. at 140, 98 S.Ct. at 1724. While the Court recognized that "[s]uch percentages may provide assistance," the Court noted that there are clearly cases where the percentage of nonpertinent calls is relatively high, and yet their interception is still reasonable. *Id.* When nonpertinent calls are short, ambiguous in nature, and/or involve guarded or coded language, "agents can hardly be expected to know that the calls are pertinent prior to their termination" and hence their interception is entirely reasonable. *Id.*

The Supreme Court and various appellate courts have suggested a variety of factors to consider in deciding the reasonableness of minimization efforts. First, courts have examined the focus of the investigation. "[W]hen the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." *Scott,* 436 U.S. at 140, 98 S.Ct. at 1725; *Ozar,* 50 F.3d at 1447; *Earls,* 42 F.3d at 1325. This is especially true when the judicially approved wiretap is designed to identify unknown coconspirators. *See Armocida,* 515 F.2d at 44. On the other hand, when the investigation is focussed on a finite, single criminal event, the investigation should be expected to be more narrow. Second, courts have looked at the types of calls being received on the telephone being tapped. The bugging of a private phone of a

named target justifies broader surveillance than the bugging of a public phone. *Scott,* 436 U.S. at 140, 98 S.Ct. at 1725. Third, courts have looked to the thoroughness of the government's efforts towards minimization. *See London,* 66 F.3d at 1236; *Torres,* 908 F.2d at 1423. If agents are instructed to and actually do minimize nonpertinent conversations by using minimization techniques, such as spot checks, a finding of reasonableness is more likely. *Torres,* 908 F.2d at 1423. Fourth, courts have scrutinized the degree of judicial supervision during the monitoring. "Where the authorizing judge has required and reviewed reports [from the government] at frequent intervals, a reviewing court may take such supervision through reports into consideration in determining whether a reasonable effort to minimize was attempted." *Armocida,* 515 F.2d at 44–45. *See also, London,* 66 F.3d at 1236; *Sorapuru,* 902 F.Supp. at 1329. Finally, courts have looked to the timing of the intercepted conversations, recognizing that "monitors may need to listen for longer periods of time in the early stages of . . . investigations in order to determine the identity of speakers and the significance of conversations." *Sorapuru,* 902 F.Supp. at 1329; *see also Scott,* 436 U.S. at 141, 98 S.Ct. at 1725; *Willis,* 890 F.2d at 1102 (10th Cir.1989).

## E. The Government's Prima Facie Showing of Reasonable Minimization in this Case

In applying these factors to this case, the Court has no doubt that the government has successfully made a prima facie showing of reasonable minimization. A number of factors point toward this conclusion. First, the government's monitoring equipment in this case, a "spike-mike" in Bankston's personal office and a wiretap on Bankston's phone line in his office, was set up in such a way so as to limit the interceptions virtually to those involving Bankston, the primary target of the investigation. The monitored areas were not generally used by other parties, but rather were areas where the conversations intercepted would almost exclusively be those involving Bankston. This goes a long way toward showing that the government was attempting to ensure that the number of

nonpertinent conversations would be kept at a minimum. As the government points out, it also ironically skews the statistics regarding minimization. By intercepting only conversations in which Bankston was involved, the investigation was narrowly tailored so that almost every interception was of a target of the investigation. Thus, it would be unreasonable to expect the same statistical minimization that would occur in cases where communications of nontargets were also being intercepted.

Second, all of the FBI agents who participated in collecting the authorized interceptions were given a minimization lecture by Assistant U.S. Attorney Randall B. Miller. See Defendant's Suppression of Electronic Surveillance Memo, Exhibit 15, Second Report to the Court ("Second Ten–Day Report") at 2. Additionally, all monitoring agents were required to read written minimization instructions, as well as the Court Order requiring interceptions to be minimized. *Id.*

Third, the monitoring agents used minimization techniques, such as "spot checking", to reduce the number of nonpertinent conversations that were intercepted. The Court has read through every tech log generated by the wiretap and the "spike mike" in Bankston's office. Those logs reveal a systematic effort at minimization. While the record reflects that a significant number of noncriminal calls were intercepted—89.7% of calls in the first month of the wiretap in Bankston's office were identified as noncriminal in the 10 Day Reports to the Court—the specific facts of this case demonstrate the reasonableness of that number. The record indicates that the government had been informed that Bankston specifically stated that there were other individuals with whom he would be sharing the proceeds of his planned extortion, but he refused to identify who those persons were. The courts have recognized that in such instances, it is reasonable for the government to intercept a larger number of nonpertinent conversations in order to determine the identities of the suspected coconspirators. *See Scott,* 436 U.S. at 140, 98 S.Ct. at 1725; *London,* 66 F.3d at 1236. Moreover, when pertinent calls, incomplete calls, and calls under three minutes [10] are excluded from consideration, the record reveals that approximately 67% of all nonpertinent, completed calls which were over three minutes in length were minimized on the wiretap in the first month of surveillance,[11] a

---

10. Many courts have held that calls lasting less than three minutes cannot reasonably be expected to be minimized since it takes that long to ascertain the relevancy of a particular conversation. *See Bynum v. United States,* 423 U.S. 952, 954, 96 S.Ct. 357, 358, 46 L.Ed.2d 277 (1975) (Brennan, J., dissenting) (recognizing that "calls of short duration will generally have to be monitored in toto" and using three minute cut-off figure); *United States v. Losing,* 560 F.2d 906, 909 n. 1 (8th Cir.), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977) (upholding three minute cut-off figure). *See also, United States v. Lamantia,* 1996 WL 559950 at *13 (N.D.Ill. Sept.30, 1996) ("Courts have generally concluded that calls less than two or three minutes in duration are too short to minimize."); *United States v. Castiglia,* 1987 WL 47776 at *3(W.D.N.Y. Dec.29, 1987) (using three minute cut-off); *United States v. Roth,* 669 F.Supp. 1383, 1386 n. 6 (N.D.Ill. Aug. 13, 1987) (same); *United States v. Shakur,* 1987 WL 4958 at *2 (S.D.N.Y. June 30, 1987) ("it is reasonable for agents to listen to the first two or three minutes of conversations to see whether they are pertinent"); *United States v. Costello,* 610 F.Supp. 1450, 1476 (N.D.Ill. June 10, 1985) (using three minute cut-off), *aff'd, United States v. Olson,* 830 F.2d 195 (7th Cir.1987) (Table), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 708, 98 L.Ed.2d 658 (1988). While some courts have applied a two minute cut-off mark, *see Willis,* 890 F.2d 1099; *United States v. Apodaca,* 820 F.2d 348, 350 (10th Cir.), *cert. denied,* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 202 (1987); *Armocida,* 515 F.2d at 45; *United States v. Bynum,* 485 F.2d 490, 500 (2d Cir.1973), *vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974), the three minute cut-off has been applied in cases, such as this one, where the identity of various coconspirators is unknown. *See e.g., Losing,* 560 F.2d at 909 n. 1 ("At least in a case such as this, where the alleged conspiracy involves numerous persons whose identity is difficult to ascertain, we are satisfied that this practice [i.e., intercepting conversations of up to three minutes] complies with the statute."). The Court finds a three minute cut-off reasonable in this case as there were a number of potential coconspirators identified by Bankston whose identities were difficult to ascertain.

11. This figure was calculated using the statistics offered *by the defendant* in his response to the government's second submission regarding minimization. *See* Record Doc. No. ——, Defendant's Minimization Submission, Exhibit 2. Based on the defendant's statistics, 99 calls in

figure that is well within the range of reasonableness that other courts have found in similar cases.[12] *See e.g., Willis,* 890 F.2d at 1101–02 (approving 70% minimization rate based upon a similar analysis); *Parks,* 1997 WL 136761 at *11–15 (approving one wiretap with a 50% minimization rate and three wiretaps with a 69% minimization rate based upon a similar analysis); *United States v. Villegas,* 1993 WL 535013 at *9 (S.D.N.Y. Dec.22, 1993) (approving wiretap with 26% minimization rate based on similar analysis); *United States v. Grabow,* 621 F.Supp. 787, 793 (D.Colo.1985) (approving a 57.1% minimization rate).

Fourth, "the fact that other criminal activity was disclosed by the communications, separate from that which provoked the surveillance, does not mean the monitoring was inappropriate." *United States v. Davis,* 1995 WL 608464 at *2 (E.D.La. Oct.13, 1995). The courts have held that the interception of conversations that may relate to offenses other than those specifically enumerated in the wiretap application and affidavit is acceptable if disclosed to the district judge. *See, e.g., United States v. Masciarelli,* 558 F.2d 1064, 1067 (2d Cir.1977) ("where a law enforcement officer lawfully engaged in a search for evidence of one crime inadvertently comes upon evidence of another crime the public interest militates against his being required to ignore what is in plain view"). *Accord, United States v. Ardito,* 782 F.2d 358, 362 (2d Cir.), *cert. denied sub nom., Pollina v. United States,* 475 U.S. 1141, 106 S.Ct. 1792, 90 L.Ed.2d 338 (1986), *cert. denied,* 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986) (even though warrant issued for electronic surveillance did not include a specific crime as a possible violation, authorization could be inferred when judge authorizing extension of tap was made aware of material facts constituting or clearly relating to other offenses in application for extension); *United States v. Gerena,* 653 F.Supp. 974, 977–79 (D.Conn.

1987). In this case, Judge Polozola was informed whenever the government intercepted a call it considered to be criminal that was unrelated to the Jena Choctaw casino project. That Judge Polozola determined that the government was acting in a proper manner further supports the conclusion that the government's minimization efforts were reasonable even though it was intercepting communications having to do with potential criminal activity that did not involve the project described in the original warrant—namely, the proposed Jena Choctaw casino project.

Finally, the government regularly reported the results of its interceptions in written 10 day reports and in oral reports to Judge Polozola. This further supports the general conclusion that their minimization efforts were reasonable. "Where the authorizing judge has required and reviewed such reports at regular intervals, a reviewing court may take such supervision through reports into consideration in determining whether a reasonable effort to minimize was attempted." *Armocida,* 515 F.2d at 45. In this case, Judge Polozola was informed of the number of intercepted calls, the number of calls minimized, and the number and type of calls that the government considered to be criminal. His determination that the government was acting in a proper manner further supports this Court's conclusion that the government's minimization efforts were reasonable.

The Court has no doubt that, in light of all of these considerations, the government has made more than a prima facie showing of reasonable minimization. In light of the strength of this showing, there can be no doubt that the remedy of total suppression is unwarranted.

### D. Bankston's Allegations of Unreasonableness

■ Once the government makes a prima facie showing of reasonableness, the burden

---

the first month of the wiretap were over three minutes and non-criminal in nature. Of these, 66 calls were minimized.

**12.** While this Court does not have an exact figure for minimization of nonpertinent calls over three minutes on the "spike mike", the statistics for the spike mike, while slightly lower than those for

the phone tap, are approximately in the 60% range, which this Court also finds to be reasonable. Defendant admits that other taps in this case, such as those in the Eastern District, have an even higher minimization rate than this. *See* Defendant's Response to Government's Second Minimization Submission at 4.

shifts to the defendant to show that the government's efforts were not reasonable. *See Torres,* 908 F.2d at 1423; *Willis,* 890 F.2d at 1102; *Armocida,* 515 F.2d at 45; *Rizzo,* 491 F.2d at 217; *Sorapuru,* 902 F.Supp. at 1330. The Court finds that Bankston has failed to meet this burden.

Bankston offers seven reasons why the minimization efforts of the government were insufficient in this case. First, Bankston argues that because the wiretap and spike-mike were both placed in his law office, more care should have been taken to minimize conversations that potentially contained attorney-client privileged material. Second, Bankston argues that the initial surveillance order concerned the specific topic of the Jena Choctaw Indian casino project and that the government listened to conversations without regard to whether they pertained to the Jena Choctaw casino deal. Third, Bankston notes that a large number of intercepted calls were not relevant or pertinent calls. Fourth, Bankston contends that even when pertinent calls, incomplete calls, and calls too short to minimize are excluded from the analysis, the minimization rate is unreasonably low. Fifth, Bankston charges that there was no good faith effort to avoid the interception of privileged attorney-client conversations and that these conversations were inappropriately "spot-checked" on the wall-mike even after government agents knew that the conversations involved privileged material. Sixth, Bankston complains about instances in which the government would list a particular conversation as being minimized on the 10–Day Report submitted to the authorizing judge, when in fact only one of the two microphones was minimized. Hence, the listed "minimized" conversation was, in fact, listened to in full on the other microphone. Finally, Bankston criticizes the government for what he terms "tag-team" non-minimization— namely, conversations in which both microphones were minimized, but the periods of minimization were staggered so that more of the conversation was actually being monitored than is suggested by the minimization of either microphone alone.

The Court finds that none of defendant's rationales illustrate unreasonable minimization efforts in light of the facts of this case. More importantly, however, in discussing each of these seven rationales, Bankston fails, with two notable exceptions discussed below, to identify minimization problems with specific conversations that the government actually plans to introduce into evidence. As noted above, the remedy of complete suppression is not available in the Fifth Circuit. *See Gaytan,* 74 F.3d at 554. Moreover, since this is clearly not a case where there was "flagrant disregard" of minimization duties, Bankston would not be entitled to complete suppression even if such a remedy were available in the Fifth Circuit. This Court is unaware of a single instance where the remedy of complete suppression was awarded after a court found that the government met its burden of making a *prima facie* showing of reasonable minimization efforts. *See, e.g., Parks,* 1997 WL 136761 at *15 (total suppression never allowed where government has made a prima facie case of reasonable minimization). Thus, there is no need for further inquiry, except as to those specific conversations that the defendant has identified that the government plans to introduce at trial.

■ In any event, the Court finds that minimization was reasonable even in light of the defendant's seven concerns. Many of these issues have already been addressed above. For example, the Court has already addressed Bankston's concern that many of the potentially criminal conversations intercepted by the government were outside the scope of the initial surveillance order, which concerned the specific topic of the Jena Choctaw Indian casino project. As noted above, "the fact that other criminal activity was disclosed by the communications, separate from that which provoked the surveillance, does not mean the monitoring was inappropriate." *Davis,* 1995 WL 608464 at *2. If the monitoring agents came across conversations pertaining to potentially illegal activity while spot-checking for conversations about the casino, public policy dictates that they not ignore those conversations. *See Masciarelli,* 558 F.2d at 1067; *Ardito,* 782 F.2d at 362; *Gerena,* 653 F.Supp. at 977–79. This is especially unproblematic in cases, such as this one, when the government reports these potentially criminal conversations

to the authorizing judge, and the judge implicitly authorizes the monitoring to continue.

 Likewise, the Court has already addressed Bankston's claim that the number of nonpertinent calls that were intercepted was high. As the Supreme Court has noted, "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer." *Scott*, 436 U.S. at 140, 98 S.Ct. at 1724. This is especially true in cases, such as this one, where a conspiracy is being investigated, and the identity of the coconspirators is unknown. Moreover, the Court finds that the more relevant statistic is that discussed in Bankston's fourth argument—the percentage of nonpertinent, completed calls over three minutes in length that are minimized. As explained above, the Court has concluded, after an exhausting factual inquiry, that the percentage of these calls minimized was well within the reasonable range described in the case law. *See Willis*, 890 F.2d at 1102; *Parks*, 1997 WL 136761 at *11–15; *Villegas*, 1993 WL 535013 at *9; *Grabow*, 621 F.Supp. at 793.

 Moreover, the Court is convinced that Bankston's other contentions do not lead to the conclusion that the government's minimization efforts were unreasonable. For instance, Bankston points out that the interceptions took place in his law office, necessitating a more rigorous standard of minimization so as to avoid the interception of privileged attorney-client conversations. He complains that attorney-client conversations were inappropriately "spot-checked" on the wall-mike, even after monitoring agents realized that the conversations involved privileged material. While the Court recognizes the importance of minimizing privileged conversations, it finds the defendant's suggestion that the government was obligated not to "spot-check" any conversations on the wall-mike after discovering that they involved one of Bankston's clients untenable. The wall microphone at issue enabled the monitoring agent to hear only Bankston's end of any conversation. The only way that an agent monitoring the wall microphone could tell if one conversation had ended, and another had begun, was to spot monitor. If potentially illegal conversations were over-

heard during a "spot check", then it would be reasonable for the government to continue listening.

This is exactly what happened in the December 6, 1994 conversation, which defendant cites as an example of insufficient minimization. *See* Defendant's Electronic Surveillance Memo at 39. The call log of this conversation reveals that at some time between 9:12 and. 9:14, Bankston introduced an unidentified male to "Susan". The conversation was minimized after approximately two minutes. Periodic spot checks revealed at 9:23, that the individual in question was Bankston's client. From that point on, the monitoring agent performed ten periodic "spot checks", *none of which were more than one minute long*. This is entirely reasonable considering that the monitoring agent in question had no way of determining when the conversation with the 'client' would end. In the last "spot check", a potentially criminal statement was intercepted, and the agent thereafter continued listening. *See* Record Doc. No. 158 at 34–35 and at Exhibit 7. The Court finds this to be entirely reasonable.

 Finally, the Court finds that Bankston's charges that there were conversations where only one of the two lines was minimized and where there was "tag-team nonminimization", the Court finds that these violations, even if proved as alleged, definitely would not rise to the level of a flagrant violation requiring total suppression of the electronic surveillance. This is especially true since the government claims to have identified the problem and corrected it in good faith. As set forth above, perfect minimization is not legally required; rather, a good faith effort suffices. *See London*, 66 F.3d at 1235. Moreover, Bankston does not request suppression of any specific calls that fell victim to either of these two asserted delinquencies, nor does he claim that any of the conversations that the government plans to introduce into evidence involved this problem. There is therefore no need for the Court to examine them any further.

### E. Bankston's Specific Challenges to Particular Conversations

In addition to Bankston's general minimization challenge, he also makes a specific challenge as to two individual calls: a December 28, 1994 conversation between Bankston and Fred Goodson and a February 17, 1995 conversation between Bankston and his wife. The Court is convinced that the government's minimization efforts as to each of these conversations were reasonable and will discuss each in turn.

### 1. December 28 Conversation between Bankston and Fred Goodson

Bankston contends that a December 28 conversation between Bankston and Fred Goodson, which was not minimized, should be suppressed because the monitoring agents kept listening to the conversation even after it was apparent that it had nothing to do with the Jena Choctaw Indian casino project. *See* Defendant's Suppression of Electronic Surveillance Memo, Exhibit 27 and Government's Electronic Surveillance Opposition Memo, Exhibit 9, Transcript of December 28 Conversation between Bankston and Fred Goodson ("Transcript of December 28th Conversation").

The government identified this conversation as involving criminal activity in its Fourth 10 Day Report to the Court on January 5, 1995 and provided the reviewing Court with the details of the potentially incriminating conversation. The Court finds the government's interception of this call to have been objectively reasonable.

To understand the reasonableness of the government's actions, it is necessary to describe the backdrop against which the December 28th conversation was intercepted. The government's investigation of Bankston started off as an investigation of his violation of various federal statutes in connection with his reported efforts to extort an interest for himself in the Jena Choctaw Casino, a gambling project. Prior to December 28th, the government intercepted six conversations in which Bankston was reportedly involved in potentially criminal activity involving similar extortionate conduct with the owners of other business enterprises. These potentially criminal interceptions were reported both in writing and orally to the supervising Judge. In addition, the government had intercepted a conversation in which Bankston stated that he was "trying to keep his fingers in all pies." Defendant's Suppression of Electronic Surveillance Memo, Exhibit 15, Second 10–Day Report at 5. This conversation was also reported to the supervising Judge. As to gambling, Bankston had already stated that he had been around it a long time without making money on "any of it," and that was why he would not let the Jena Choctaw Casino deal "get past him." *See* November 25, 1994 Affidavit at 11. It was against this backdrop that the monitoring agents listened to the December 28th conversation with Fred Goodson.

The transcript of the December 28th conversation reveals that, from early on in the conversation, Goodson started reporting to Bankston specific details of Goodson's truck stop business that one would not normally provide to one who was not a participant in the endeavor. For example, Goodson spoke approvingly of using a local engineer on a large, ambitious construction project involving multiple truck stop locations, instead of one from Vegas or California. Transcript of December 28th Conversation at 3–4. He also mentioned a potential problem with other video poker truck stop developers. Bankston indicated that these individuals had been referred to him by another legislator, and Bankston suggested that Goodson try to work "a swap or something like that" with them. *Id.* at 12.

It is important to note that the mention of another legislator in this context was intercepted after the FBI had learned that Bankston had stated that "[t]here are some other people from Louisiana that I will need to take care of. . . ." November 25, 1994 Affidavit at 12. At this time, the FBI did not know who those other "people from Louisiana" were. It was certainly reasonable for them to continue listening in light of this information.

Shortly thereafter in the transcript, Goodson discussed various properties in south Louisiana as potential sites for gaming operations, and Bankston expressed keen interest

in Goodson's scheduled timing to open video poker facilities in Hammond and Denham Springs. *Id.* at 13–15. In connection with the potential site in Denham Springs, Bankston stated that he had been calling Livingston Parish officials to try to tell them that some of the things that they were proposing in connection with Goodson's site, they "probably couldn't do." *Id.* at 15. He then told Goodson he did so to "try to keep it in play." *Id.* In light of the FBI's belief that Bankston was planning to exchange his political influence for an interest in the casino project and Bankston's statement that because he had been around gambling a long time without making any money off of it and was not going to let "this one get past me," it was reasonable for the monitoring agents to continue listening when Bankston made statements that could reasonably be interpreted as involving the use of his political influence to help keep someone's gambling operation "in play."

As the agent continued to listen, Goodson invoked the names of various individuals who had been involved in major FBI investigations in Louisiana over the past 10 years, as well as in investigations into illegal gambling related activity in New Orleans. Shortly thereafter, Goodson broached the subject that forms the basis for the present indictment, discussing with Bankston the possibility of having a "core group" of legislators participate in a hidden ownership interest in video poker truck stops. The "other legislator" discussed early-on in the conversation turned out to be part of that core group. Thereafter, Bankston told Goodson that he viewed "his job" as seeing "that there's no piece of legislation passed period," *id.* at 45, and that he wanted to participate in as many of the video poker truck stop locations as possible. *Id.* at 52.

In light of the background information available to the monitoring agents and the nature of some of the remarks at the beginning of the conversation, it cannot be said that the monitoring agent was unreasonable in continuing to listen to the conversation in order to determine if the conversation involved criminal activity beyond a legislator's duty. Moreover, the specific facts of this case, which involve a potentially wide-ranging conspiracy in which the coconspirators had not been identified, and the timing of this interception, which took place towards the beginning of this investigation, mandate that the monitoring agents be given some leeway in performing the investigation. *See Scott,* 436 U.S. at 141–42, 98 S.Ct. at 1725. Finally, it is easy in hindsight to say that a particular conversation was not potentially criminal at the outset, and therefore should not have been monitored, but the law is clear that reasonableness, and not prescience, is all that is demanded of government agents. *See, e.g., Cox,* 462 F.2d at 1301 ("It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take.") (quoting *United States v. LaGorga,* 336 F.Supp. 190, 196 (W.D.Pa.1971)). In light of all of the above, the Court finds the monitoring agent's actions in listening to this conversation were objectively reasonable. Therefore, neither suppression nor an evidentiary hearing is warranted as to this conversation.[13]

### 2. February 17, 1995 Conversation between Bankston and His Wife

■ Bankston also objects to the use of "spot-checking" in a minimized conversation between him and his wife, Lynn Bankston. Bankston contends that there is no basis for "spot-checking" this conversation because the monitoring agents knew that it was subject to the marital privilege. Bankston argues that as soon as the monitoring agent discovered that the conversation was between

---

13. Defendant wants an evidentiary hearing to probe the agent's subjective state of mind. In light of the Court's determination that the agent's conduct was objectively reasonable, such an endeavor is unnecessary. *See Scott,* 436 U.S. at 137–38, 98 S.Ct. at 1723 ("We have since held that the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.").

**1100**

Bankston and his wife, all monitoring should have ceased.

The Court finds that the use of "spot-checking" was reasonable in this instance because the government already had information reasonably leading them to believe that Bankston and his wife had discussed potentially criminal activity, *i.e.*, Bankston's interest in Fred Goodson's video poker locations. For example, in the December 28th conversation between Bankston and Goodson discussed above, the following exchange occurred:

Bankston: I do want to participate in as many of these locations ... as I can.

Goodson: Okay. But see I've got down, down, down in uh, down in Marrero and Gretna we've got uh Nunez, I was trying to do something in his hometown and we couldn't. So he said his territory was St. Bernard Parish and those locations are in St. Bernard they're not in West Westwego. But uh, we went and we went and talked with John about what we were doing down there and got his blessing there right and you there within a stone's throw—

Bankston: Within his office.

Goodson: One of em is of his office. But uh, it appears that it's all go right now.

Bankston: Yeah.

Goodson: And I don't want to commit myself to these people and then turn around and, and not be able to produce and I think we're producing. It's just taking a little bit longer—

Bankston: Yeah.

Goodson: (Inaudible)

Bankston: And that's the problem, we've got to get these in sync. *My wife is about to choke me Fred* (laughs)

Goodson: (Laughs) For what?

Bankston: *She said where is all this happening? (snickers) The worst thing about this Fred is I'm married to a CPA.*

Goodson: Oh my gosh.

Bankston: *Nothing worse than a CPA for a wife. She's I mean, she, she understands the—*

Goodson: She (inaudible) (laughs) It ain't gonna be good and I—

Bankston: All right.

Goodson: And I hope that other one of three thousand acres, we're gonna bid on that next month. I hope that comes up. Then we can be productive a little bit.

Transcript of December 28th Conversation at 52–54 (emphasis added).

Moreover, in a December 13, 1994 interception, Bankston and his wife discussed potentially criminal activity. According to the January 4, 1995 affidavit in support of the wiretap application, Bankston and his wife discussed how much money Bankston should take in exchange for Bankston's assistance in helping Steve Gatto get the relevant permits for Gatto's purchase of the Wyman Sheppard Ethanol Plant. *See* Defendant's Electronic Surveillance Opposition Memo, Exhibit 5, January 4, 1995 Affidavit, at paragraph 13(b)(3). The government summarized that conversation as follows:

[O]n December 13, 1994, Bankston telephoned his wife, Lynn Bankston. Bankston said he is waiting to meet Gatto, and he is going to propose Gatto give him $3,500 per month individually and a check to the firm for $1,500 per month. Bankston explained that because Gatto wanted him to do so much, some money has to go to the firm or Bankston will open himself up to a lawsuit. Lynn Bankston then said she thinks $1,000 per month to the firm is plenty, and that an extra $500 per month means a lot. Bankston commented that Lynn is greedy, but told her the first $4,000 should be in their names soon. Bankston will also proposed to get two hundred in stock.

Defendant's Electronic Surveillance Opposition Memo, Exhibit 5, January 4, 1995 Affidavit, at paragraph 13(b)(3).

 Both of these conversations preceded the February 17, 1995 interception in issue. It is well-settled that the marital privilege does not apply to conversations between husband and wife in furtherance of criminal activity. *See, e.g., United States v. Mendoza*, 574 F.2d 1373, 1381 n. 7 (5th Cir. 1978) (marital privilege does not apply to

conversations made in furtherance of a crime). "[C]onversations between husband and wife about crimes in which they are jointly participating when the conversations occur are not marital communications for the purpose of the marital privilege, and thus due not fall within the privilege's protection of confidential marital communications." *United States v. Harrelson*, 754 F.2d 1153, 1167 (5th Cir.1985) (upholding electronic interception of such conversation). Since the government agents had information from which they could have reasonably believed that Bankston and his wife were having conversations in furtherance of potentially criminal activity, it was reasonable for them to "spot-check" this conversation. Accordingly, it should not be suppressed.

## F. The Request for an Evidentiary Hearing

Bankston requests an evidentiary hearing on the minimization issue. The Fifth Circuit has yet to delineate the standard for determining whether an evidentiary hearing is required when a defendant challenges the sufficiency of minimization in the wiretap context. In making this determination, however, this Court is mindful of Fifth Circuit authority holding that evidentiary hearings on motions to suppress generally "are not granted as a matter of course, but are held only when the defendant alleges sufficient facts which, if proven, would justify relief." *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir.1983). Moreover, the Fifth Circuit has noted that, to receive an evidentiary hearing in a motion to suppress, a defendant must set forth factual allegations in his motion, which are "sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." *Id.* (internal quotations omitted). Finally, the Fifth Circuit has emphasized that "the determination of whether a hearing is required [on a motion to suppress] is necessarily dependent upon the particular facts which attend a particular request, and the district court is properly left with a certain amount of discretion in this regard." *Id.* (quoting *United States v. Losing*, 539 F.2d 1174, 1178 (8th Cir.1976), *cert. denied*, 434

U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977)).

The Second and Eighth Circuits have held that district courts are not required to hold an evidentiary hearing on the issue of minimization when affidavits submitted to the court, supplemented by logs, tapes, and/or progress reports, are more than adequate to show sufficient efforts towards minimization. *See, e.g., United States v. Cirillo*, 499 F.2d 872, 880–81 (2d Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974) (finding that when materials submitted to court are more than adequate to show a good faith effort to achieve minimization, an evidentiary hearing need not be held unless the defendant can demonstrate that "a substantial number of nonpertinent conversations had been intercepted unreasonably"); *United States v. Losing*, 539 F.2d 1174, 1180 n. 8 (8th Cir.1976), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977) (recognizing that district courts need not grant a hearing on the minimization issue in every case, especially when affidavits and/or progress reports enable them to make a determination that a hearing is unnecessary); *see also, United States v. Paredes–Moya*, 722 F.Supp. 1402, 1408 n. 7 (N.D.Texas 1989) (citing Cirillo standard with approval in dicta), *aff'd in part, rev'd in part, United States v. Guerra–Marez*, 928 F.2d 665 (5th Cir.), *cert. denied*, 502 U.S. 969, 112 S.Ct. 443, 116 L.Ed.2d 461 (1991). This Court agrees with the views of the Second and Eighth Circuits—namely, that district courts should have discretion to deny motions for an evidentiary hearing on minimization should when they determine that a motion to suppress should be denied because affidavits, supplemented by logs and/or progress reports, convincingly show that there was adequate minimization. This is entirely consistent with the Fifth Circuit's holding that evidentiary hearings on motions to suppress generally "are not granted as a matter of course" and that the district court should be "left with a certain amount of discretion" with regard to granting them. *Harrelson*, 705 F.2d at 737.

In any event, the Court finds that Bankston failed to raise a factual issue that a

substantial number of nonpertinent conversations were intercepted unreasonably. There is no reason that in a case such as this, a district court should not be able to make a determination about the adequacy of the agents' minimization efforts without a full-blown evidentiary hearing. This is especially true in cases, such as this one, in which the court has before it an extensive record of affidavits, logs, transcripts, and progress reports that enable it to make an informed determination. Further, the Court received affidavits and data from both sides to evaluate the percentage of noncriminal calls minimized that were over three minutes. After hearing approximately one full hour of oral argument, reading hundreds of pages of memoranda, sifting through several hundreds of pages of documents, and spending countless hours analyzing each tech log line by line, this Court is convinced that no evidentiary hearing is necessary. The Court finds, on the basis of the present, extensive record, that the government's minimization efforts were reasonable in general and as to the specific conversations that have been challenged. Suppression of the results of the electronic surveillance and the fruits of those interceptions is therefore not required by law on account of inadequate minimization.

### III. Alleged Improper Use of the Intercepted Communications

Bankston's third and final argument for suppression is based on an alleged violation of 18 U.S.C. § 2517, which sets forth the permissible disclosures which may be made of information gathered through wiretaps.[14] Bankston accuses the government of improp-

erly unsealing the warrant affidavits while the surveillance order was still in effect, giving the press access to the affidavits, which contained a number of quoted intercepted conversations involving Bankston. Bankston points out that it was no accident that the materials were unsealed just 15 days before qualifying began for elections for the Louisiana House and Senate. He suggests that "[s]uppression of only those materials which were disclosed is a limited, appropriate remedy for this conduct." Defendant's Electronic Surveillance Memo at 52.

The Court has already denied a similar request for relief in connection with a motion to dismiss for prosecutorial misconduct brought by defendants Fred and Maria Goodson in this case. For the benefit of defendant Bankston, the Court will set forth its reasoning again here.

Whether or not the government's actions were improper under 18 U.S.C. § 2517, the Court must note that the Fifth Circuit has not allowed the relief of suppression when there are improper disclosures of intercepted information in violation of 18 U.S.C. § 2517. *See Fleming v. United States*, 547 F.2d 872, 874 (5th Cir.), *cert. denied*, 434 U.S. 831, 98 S.Ct. 113, 54 L.Ed.2d 90 (1977) (when legally obtained wiretap information is improperly disclosed, suppression of that evidence is not required). Rather, the suppression remedy is limited to circumstances in which the interception itself was in violation of the statute.

In *Fleming*, the Fifth Circuit closely examined 18 U.S.C. § 2515, the statutory provision that spells out the circumstances in

---

**14.** The statute provides for three permissible disclosures:

(1) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

(2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communi-

cation or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties.

(3) Any person who has received, by any means authorized by this chapter, any information concerning a wire, oral, or electronic communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.

18 U.S.C. § 2517 (1996).

which suppression of intercepted communications is required. That statute provides that:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communications and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515 (1996).

In interpreting this statute, the *Fleming* Court noted that it was "poorly drafted" and even "circular" when read literally. The Court interpreted the statute as follows:

> [The statute] proscribes the reception into evidence (and thus the disclosure) of information the disclosure of which "would be in violation of this chapter." "Disclosure" apparently refers to disclosure at trial rather than disclosure among various departments of the government at some earlier point; otherwise, the statute would presumably refer to information the disclosure of which 'has been' in violation of the chapter.

*Fleming,* 547 F.2d at 874.

The Court concluded that the statute was not intended to allow for suppression of legally seized interceptions, even when they were improperly disclosed:

> The section's primary purpose is apparently to exclude evidence derived from illegal, rather than legal, wiretaps. The section's main thrust is therefore to exclude evidence the *seizure* of which was in violation of the chapter, not evidence the *disclosure* of which was or would be in violation of the chapter.

*Id.* (emphasis added).

While the facts of *Fleming* were notably different than those in this case, the Court sees no reason why the rationale of *Fleming* does not apply to these facts. Further, other courts have applied *Fleming* to preclude suppression of improperly disclosed wiretap interceptions in other contexts, including that of improper disclosures to the press. *See United States v. Cardall,* 773 F.2d 1128, 1134 (10th Cir.1985) (sole remedy for violations of 18 U.S.C. § 2517 is civil action under 18 U.S.C. § 2520); *Dickens v. United States,* 671 F.2d 969, 972 (6th Cir.1982) (finding suppression remedy appropriate only for wiretap evidence that has been illegally seized and not for evidence that has merely been improperly disclosed); *United States v. Horton,* 601 F.2d 319, 324 (7th Cir.), *cert. denied,* 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979) (main thrust of 18 U.S.C. § 2515 is to exclude evidence illegally seized, not evidence the disclosure of which was in violation of chapter 119 of the United States Code); *United States v. Iannelli,* 477 F.2d 999, 1001 (3d Cir.1973), *cert. granted by,* 417 U.S. 907, 94 S.Ct. 2602, 41 L.Ed.2d 211 (1974), *aff'd on other grounds,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975) (suppression remedy specified in 18 U.S.C. § 2518(10) applies to unlawful interceptions, whereas a civil remedy applies to unlawful disclosures); *United States v. Dorfman,* 532 F.Supp. 1118 (N.D.Ill. 1981) (refusing to apply remedy of suppression as a matter of law when defendants alleged that the government disclosed material obtained from wiretaps and other electronic surveillance to the press in violation of 18 U.S.C. § 2517).

As several courts have noted, the appropriate remedy for improper disclosures of wiretapped information is a civil remedy under 18 U.S.C. § 2520. That provision states that:

> Any person whose wire ... communication is ... disclosed ... in violation of this chapter shall (1) have a civil cause of action against any person who ... discloses ... such communications, and (2) be entitled to recover from any such person ... actual damages; ... punitive damages; and ... a reasonable attorney's fee and other litigation costs reasonably incurred.

18 U.S.C. 5 2520 (1996). *See Cardall,* 773 F.2d at 1134; *Iannelli,* 477 F.2d at 1001. As Bankston's only appropriate remedy for a violation of 18 U.S.C. § 2517 is a civil action under 18 U.S.C. § 2520, his motion to suppress those interceptions he alleges to have been improperly disclosed to the press must be denied.

Accordingly,

IT IS ORDERED that defendant Bankston's motion to suppress results of electronic surveillance and all evidence derived from such results, and motion for evidentiary hearing is hereby DENIED.

IT IS FURTHER ORDERED that defendant Bankston's motion for "appropriate relief", requesting production of a tape of a September 21, 1994 meeting between Robert Miller and Terry Dunlevy is hereby DENIED.